## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSHUA SABEY, SARAH PERKINS, JOSHUA SABEY and SARAH PERKINS on behalf of C.S. 1 and C.S. 2, minors, | Civil Action No. 1:23-cv-10957 |
| Plaintiffs, v. | **COMPLAINT** |
| KATHERYN BUTTERFIELD, AARON GRIFFIN, CAROLYN KALVINEK, BONNIE ARUDA, ANTHONY SCICHILONE, RICHARD COUTURE, ELIAS MAKRIGIANIS, STEFANO VISCO, and CITY OF WALTHAM, MASSACHUSETTS. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## INTRODUCTION

1.     Sarah Perkins and Joshua Sabey are the loving parents of two young boys, C.S. 1 and C.S. 2. They have never abused, harmed, or neglected their children, nor have they ever been charged with any civil or criminal offense related to their parenting. Josh and Sarah are devoted parents who are raising their children with a parenting philosophy that emphasizes compassion and trust in the innate goodness of people.

2.     Nevertheless, at approximately one o'clock in the morning of July 16, 2022, officials with the Waltham Police Department (WPD) and Massachusetts Department of Families (DCF) knocked on the Sabeys' door and demanded they

1

surrender their children to the government, threatening to break into their quiet residential home if they did not comply. Ultimately, the officials physically seized the two young boys and drove off into the night. The Sabeys would not regain full custody of their children for another four months.

3.      These actions were reprehensible and plainly unconstitutional. The officials had no warrant to enter the Sabeys' home or seize the young Sabey children, and there was no plausible imminent threat that could justify entering the home and seizing the sleeping toddler and infant from their loving parents and family home in the middle of the night.

4.      The warrantless entry into the home and the seizure of the Sabey children justifiably produced domestic and international outrage. To this day, neither DCF nor the WPD have offered any tenable justification, excuse, or apology for their lawless actions.

5.      While the Sabeys were ultimately—and obviously—cleared of any wrongdoing, and the children were eventually reunited with their parents, nothing can undo the trauma of that early July morning and the prolonged abrogation of the Sabeys' parental rights. For parents, the emotional and physical toll of having your crying children torn from your arms never goes away.

6.      The Sabeys bring this action to vindicate their constitutional rights and to ensure no other family has to endure the horrors they experienced.

## JURISDICTION AND VENUE

7.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988. The Court has jurisdiction over the Sabeys' federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343(a) (redress for deprivation of civil rights). This Court has supplemental jurisdiction over the Sabeys' state law claims under 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants are residents of this judicial district and the Commonwealth of Massachusetts. Venue is also proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## PARTIES

### *Plaintiffs*

9.      Joshua Sabey is a citizen of the State of Idaho. At all times relevant to this action, Josh was a citizen of Massachusetts. He is the biological father and legal guardian of C.S. 1 and C.S. 2.

10.     Sarah Perkins is a citizen of the State of Idaho. At all times relevant to this action, Sarah was a citizen of Massachusetts. She is the biological mother and legal guardian of C.S. 1 and C.S. 2.

11.    C.S. 1 is a minor and a citizen of the State of Idaho. At all times relevant to this action, C.S. 1 was a citizen of Massachusetts. C.S. 1 brings this action by his parents, guardians, and next friends Sarah Perkins and Josh Sabey.

12.    C.S. 2 is a minor and a citizen of the State of Idaho. At all times relevant to this action, C.S. 2 was a citizen of Massachusetts. C.S. 2 brings this action by his parents, guardians, and next friends Sarah Perkins and Josh Sabey.

### *Defendants*

13.    Katheryn Butterfield is an Area Program Manager with the Massachusetts Department of Children and Families. She is sued in her personal capacity.

14.    Aaron Griffin is a supervisor with the Massachusetts Department of Children and Families. He is sued in his personal capacity.

15.    Carolyn Kalvinek is an employee with the Massachusetts Department of Children and Families. She is sued in her personal capacity.

16.    Bonnie Aruda is a response worker with the Massachusetts Department of Children and Families. She is sued in her personal capacity.

17.    Anthony Scichilone is a police officer with the Waltham Police Department. He is sued in his personal capacity.

18.    Richard Couture is a police officer with the Waltham Police Department. He is sued in his personal capacity.

19.     Elias Makrigianis is a police officer with the Waltham Police Department. He is sued in his personal capacity.

20.     Stefano Visco is a police officer with the Waltham Police Department. He is sued in his personal capacity.

21.     City of Waltham is a municipal corporation, organized under the laws of the Commonwealth of Massachusetts, which is sued because of the acts and omissions of the police department, which it maintains as a department or division of the City of Waltham.

## ALLEGATIONS

### *C.S. 2 develops a fever and is taken to the hospital*

22.     During the afternoon of July 12, 2022, C.S. 2, then a three-month-old infant, began vomiting and developed a fever.

23.     His mother, Sarah Perkins, called her pediatrician's office and spoke to an on-call nurse who advised her to give C.S. 2 a dose of children's Tylenol and continue monitoring him, but to bring him to the hospital emergency room if his fever spiked above 103 degrees.

24.     At approximately 2:00 a.m. on July 13, after C.S. 2's fever registered 103.5 degrees, Sarah took him to the emergency room at Newton Wellesley Hospital in Newton, Massachusetts. Her husband, Josh Sabey, remained at home with their three-year-old son, C.S. 1.

25.    At the hospital, C.S. 2 was examined and determined to have low oxygen levels and a respiratory infection. Sarah consented to a chest x-ray to check C.S. 2's lungs for possible pneumonia.

### The hospital investigation

26.    The x-ray revealed that C.S. 2 had a healing rib fracture, which was estimated to be between 10 days and 6 weeks old.

27.    The healing rib fracture was a cause of concern to hospital officials. During morning rounds at about 8:00 a.m. on July 13, Sarah was informed of the rib fracture and questioned about the source of the injury.

28.    Sarah truthfully responded that she and Josh had been unaware of the rib fracture and did not know what could have caused it.

29.    The hospital ordered more detailed x-rays and further testing of C.S. 2, including a full skeletal scan that showed that the rib injury actually comprised two adjacent healing rib fractures, but no additional injuries.

30.    Concerned about health risks posed by the repeated scans and tests on her young infant, and feeling that hospital staff were ignoring C.S. 2's serious respiratory illness in favor of investigating the nearly healed rib fractures, Sarah initially declined to consent to a brain scan for C.S. 2. Sarah eventually signed the consent form for the brain scan, although she noted that she did not believe these

additional tests were in C.S. 2's best interests. The brain scan did not reveal any issues or concerns.

31.    Hospital social worker Jill Saks conducted multiple interviews of Sarah at the hospital on July 13.

32.    Sarah reiterated in these interviews that she did not know what could have caused the rib fractures, although when pressed to speculate, she posited that perhaps they were due to C.S. 2's short fall from a bed several weeks before. That fall had not resulted in any apparent injury.

33.    Sarah truthfully denied to Ms. Saks that there was any domestic abuse in the home. She further confirmed that no one in the family used drugs or alcohol and that there was absolutely no substance abuse in the home.

34.    Hospital officials also spoke with the Sabeys' pediatrician, who reported that she had zero concerns about abuse with the Sabey family or about C.S. 2's safety and well-being.

35.    At the hospital's request, father Josh Sabey took the Sabeys' three-year-old son, C.S. 1, to the pediatrician to be medically cleared. The pediatrician thoroughly examined C.S. 1 and found no signs of abuse, mistreatment, or injury.

### The DCF investigation – Day 1 (Wednesday)

36.    At 4:36 p.m. on July 13, Ms. Saks sent a report to the Massachusetts Department of Children and Families (DCF) alleging physical abuse of C.S. 2 by his

parents. The report detailed the injuries to C.S. 2's ribs and stated that Sarah's "affect" was "flat" and that she "rolled her eyes" when being questioned. The report further stated that the rib fractures were not consistent with a fall from a bed.

37.    Shortly after receiving the report from the hospital, DCF sent emergency response workers Axel Rivera and Ana Piedade to the hospital to investigate whether there were indications of abuse or neglect of the Sabey children.

38.    Rivera and Piedade met with hospital officials, who spoke with them about the injury to C.S. 2's ribs. Rivera and Piedade learned at that time that there were no signs of domestic abuse, no signs of substance abuse, and that the Sabeys' pediatrician had told hospital officials that she had zero concerns.

39.    After speaking with hospital officials, Rivera and Piedade individually interviewed Josh, Sarah, and three-year-old C.S. 1 at the hospital.

40.    After being interviewed by Rivera and Piedade, Josh and C.S. 1 returned home. Sarah and C.S. 2 were required to remain at the hospital overnight.

41.    At about 10:40 p.m. the night of July 13, after Josh and C.S. 1 had returned home, Piedade and Rivera went to the Sabeys' home in Waltham located at 137 Charles Street, where they examined the home and reported that they "did not observe any concerns with the home condition."

42.    By the end of Day 1 of DCF's investigation, DCF knew with certainty that (1) there were no concerns with the Sabey home; (2) there was no evidence of

domestic abuse; (3) there was no evidence of substance abuse; (4) there was no evidence of harm or injury to either child, other than C.S. 2's healing rib fractures; and (5) the Sabeys' pediatrician had told hospital staff that she had no concerns.

### *The DCF investigation – Day 2 (Thursday)*

43.     On July 14, at approximately 9:30 a.m., Rivera continued his investigation by speaking directly with the Sabeys' pediatrician, Dr. Kristen Haddon.

44.     Rivera recorded that Dr. Haddon "has not had any concerns of [C.S. 2]'s wellbeing and was surprised about the injuries." Dr. Haddon also told Rivera that C.S. 2 was up to date medically and that his parents take him to monthly pediatrician visits, including multiple visits in June 2022, none of which had ever revealed any concerns of abuse, injury, or neglect.

45.     Rivera recorded that Dr. Haddon further confirmed that the Sabeys' older child, C.S. 1, had "not shown any concerns."

46.     Rivera also spoke to Dr. David Dominguez, who had completed the medical clearance on C.S. 1 the day before at the hospital's request. Rivera recorded that Dr. Dominguez "reported no concerns" with C.S. 1, that "there were no indications of anything concerning," and that "there were no injuries" with C.S. 1.

47.     Rivera also contacted the Waltham Police Department to request background checks on Josh and Sarah. These showed that there had not been any police calls to the Sabey home and revealed no concerns for either Josh or Sarah.

48.     At approximately 3:00 p.m. on July 14, with obviously no imminent concern about the health of the two boys, DCF officials allowed Sarah and C.S. 2 to leave the hospital and go home.

49.     At approximately 5:00 p.m. that same day, Rivera spoke via telephone with Josh about a safety plan for the family. After the conversation, Rivera emailed a copy of the proposed safety plan to him.

50.     Rivera also scheduled a follow-up visit with the Sabeys for after the weekend, on Monday, July 18, at 12:00 p.m.

51.     Zero evidence of abuse was uncovered on Day 2 of DCF's investigation. And DCF properly released Sarah and C.S. 2 to their home.

52.     By the end of Day 2 of DCF's investigation, DCF knew with certainty that (1) there were no concerns with the Sabey home; (2) there was no evidence of domestic abuse and no police calls to the Sabey home; (3) there was no evidence of substance abuse; (4) there was no evidence of harm or injury to either child, other than C.S. 2's healing rib fractures; (5) the Sabeys' pediatrician had told hospital staff that she had no concerns; and (6) DCF had learned directly from the pediatrician that

both children received regular medical checkups and that there were no concerns of abuse or neglect with either boy.

### The DCF investigation – Day 3 (Friday)

53.    On July 15, 2022, Rivera received confirmation that the Sabeys would sign the safety plan during the visit that was scheduled for July 18, 2022.

54.    At approximately 4:15 p.m. on July 15, Defendant Katheryn Butterfield, an Area Program Manager for DCF, was informed of the C.S. 2 investigation.

55.    Shortly afterward, Defendant Butterfield ordered Rivera to return to the Sabeys' home immediately and to provide her with an update following the visit.

56.    At approximately 5:15 p.m. on July 15, 2022, Rivera conducted an unannounced home visit to the Sabeys' home. He talked to the family, observed both children, and reported no concerns. He reported that C.S. 1 "was walking around and was smiling," while C.S. 2 "looked presentable" and was being held by his visiting grandmother.

57.    During the unannounced home visit, Rivera and the Sabeys agreed to move forward with the follow-up home visit scheduled for Monday, July 18, at 12:00 p.m.

58.    Shortly after his unannounced visit, Rivera informed Butterfield that he had completed the unannounced visit.

59.     Zero evidence of abuse was uncovered on Day 3 of DCF's investigation.

60.     By the end of Day 3 of DCF's investigation, DCF knew with certainty that (1) there were no concerns with the Sabey home; (2) there was no evidence of domestic abuse and no police calls to the Sabey home; (3) there was no evidence of substance abuse; (4) there was no evidence of harm or injury to either child, other than C.S. 2's healing rib fractures; (5) the Sabeys' pediatrician had told hospital staff that she had no concerns; (6) the pediatrician had told DCF directly that both children received regular medical checkups and that there were no concerns of abuse or neglect of either boy; (7) the Sabeys had agreed to adopt and implement a safety plan prepared by DCF; (8) an unannounced home visit failed to raise any concerns; and (9) the Sabeys had agreed to another home visit for the following Monday at 12:00 p.m.

### *DCF forcibly enters the Sabey home and seizes the children*

61.     Nonetheless, around 6:00 p.m. on July 15, Defendant Butterfield made the decision to forcibly remove both Sabey children from their home. She did not do so on the basis of any new evidence or information collected during DCF's investigation; instead, she based her decision on C.S. 2's healing rib fractures that DCF had been aware of for more than two days. Defendant Butterfield had no evidence of any injury or risk to C.S. 1.

62.   At approximately 8:00 p.m., Defendant Butterfield called and spoke to Defendant Griffin regarding the plan for the removal. Defendant Griffin concurred in the decision to remove the Sabey children. Neither Defendant Butterfield nor Defendant Griffin adequately considered the potential harm to C.S. 1 or C.S. 2 that would be caused by their removal from their home and family. None of the Defendants tried alternatives to removal, even though removal should be a last resort.

63.   At approximately 9:00 p.m., Defendants Carolyn Kalvinek and Bonnie Arruda, officers with DCF, were contacted and asked to forcibly remove the Sabey children from their parents and home. Defendants Kalvinek and Arruda contacted Defendant Griffin to get more information about the case and the plan for removal.

64.   At approximately 12:30 a.m. on July 16, Defendants Kalvinek and Arruda from DCF went to the police station for the Waltham Police Department to request assistance in removing the Sabey children.

65.   At approximately 1:00 a.m. on July 16, Defendants Kalvinek and Arruda from DCF, together with three police officers from WPD—Defendants Anthony Scichilone, Elias Makrigianis, and Stefano Visco—arrived at the Sabey home in Waltham.

66.   The Sabey home was a rented ground-floor apartment in a shared building with separate tenants living in an upstairs apartment. The two apartments

shared a common entryway, or breezeway, with a closed outer front door that faced the street and was frequently locked.

67.    The Sabeys accessed their apartment through this front door, as their apartment door was located just inside the front door within the breezeway.

68.    Although stairs within the breezeway led to the upstairs tenants' apartment, those tenants rarely used the front door, preferring to enter their unit through a separate external door.

69.    The Sabeys used the breezeway as an extension of their home, storing their children's outdoor toys, a stroller, and a car seat there, among other personal property, and they frequently kept the outer door to the breezeway locked.

70.    The breezeway was a part of the Sabeys' property to which the intimate activities of their daily lives extended.

71.    When they arrived at the Sabey home, the police officers took the lead in contacting the Sabeys. Defendants Makrigianis and Visco opened and entered through the outer front door into the breezeway. Defendant Makrigianis knocked on the inner door to the Sabeys' home while standing within the breezeway.

72.    After he answered the inner door, Josh asked the officials if they had a warrant. When they informed him that they did not, he refused to allow the DCF workers and WPD officials to enter the apartment.

73.     Josh told the officials to leave and return with a warrant or other court order.

74.     Despite Josh's repeated requests, the officials remained on the Sabeys' rented property, including inside the breezeway.

75.     Defendant Makrigianis stood against the front outer door, intentionally jutting his elbow into the threshold so as to prevent any attempt to close the outer door and flanking the entrance to the Sabeys' apartment home on the right.

76.     Defendant Visco stood on the bottom step of the stairs within the breezeway, flanking the door to the Sabeys' apartment home on the left.

77.     Defendant Scichilone paced the sidewalk outside the Sabey residence with his hand on his hip-holstered firearm and continued to do so as Josh questioned him about the legality of WPD and DCF's demands that he and Sarah surrender their children to them.

78.     Each WPD officer wore a dark blue uniform, had an official police badge, and was armed with a hip-holstered firearm.

79.     The DCF and WPD officials were initially evasive about the reason for their nighttime visit, saying only that they "needed to talk with the family again." Eventually, they declared that DCF was taking emergency custody of both C.S. 2 and C.S. 1 and that they were there to remove the children, who were then asleep in their beds.

80.    The WPD and DCF officials denied having any supporting paperwork with them related to the intended removal but claimed repeatedly to have "an emergency order" that authorized them to take the children.

81.    Defendant Scichilone repeatedly referred to this order as a "B3" order but provided no further explanation.

82.    Defendant Scichilone contacted his supervisor, Defendant Richard Couture, to seek guidance about the removal because he was concerned about the lack of paperwork.

83.    During the commotion, Josh placed a telephone call to the Sabeys' lawyer, who then spoke with Defendant Couture and other officials from WPD and DCF.

84.    Officers from the WPD, including Defendant Couture, told the Sabeys' lawyer that if the Sabeys did not surrender the children to the police officers at the door, they would break into the Sabeys' home and seize the children by force.

85.    When informed by their lawyer that the police were prepared to forcibly take their sleeping children, Josh and Sarah woke their children and placed them, crying, into the officials' vehicles. The children were driven away into the night.

### *The seizure of C.S. 2 and C.S. 1 was unjustified*

86.    Between 6:00 p.m. on July 15, when the decision to remove the children was made, and 2:30 a.m. on July 16, when WPD and DCF officials seized the

children from their parents and home, no officer or employee of either WPD or DCF made any attempt to acquire a judicial warrant to enter the home or seize the Sabey children.

87.     The fact of C.S. 2's healing rib fractures did not justify the forced entry and warrantless seizure of either Sabey child from their parents and family home.

88.     Between July 13, when WPD and DCF received notice of C.S. 2's healing rib fractures, and the early morning hours of July 16, neither DCF nor WPD acquired any additional information that justified the forced entry and warrantless seizure of the Sabey children from their parents and family home.

89.     Defendants Butterfield and Griffin initiated, approved, and supported the forced entry and warrantless seizure of the Sabey children.

90.     Defendants Kalvinek, Arruda, Scichilone, Makrigianis, and Visco attended and actively participated in the warrantless seizure of the Sabey children and search and seizure of the Sabey home and curtilage.

91.     Defendant Couture approved and supported the warrantless seizure of the Sabey children and search and seizure of the Sabey home and curtilage.

92.     Defendants Butterfield, Griffin, Kalvinek, Arruda, Scichilone, Couture, Makrigianis, and Visco had no probable, reasonable, or particularized cause to believe that C.S. 2 or C.S. 1 faced an imminent threat of bodily harm or any other form of abuse or neglect by Josh or Sarah.

93.     Defendants Butterfield, Griffin, Kalvinek, Arruda, Scichilone, Couture, Makrigianis, and Visco had no evidence of urgent or immediate necessity that required C.S. 2's or C.S. 1's removal from the care and custody of Josh and Sarah.

### The continued warrantless seizure of the Sabey Children

94.     After seizing the children at about 2:30 a.m. on July 16, Defendants Kalvinek and Arruda placed C.S. 2 and C.S. 1 in the care of a foster parent, where they remained for most of that day.

95.     Sometime after 5:00 p.m. on July 16, the Sabey children were taken from the foster parent's home and placed in the care of their paternal grandparents at a home in Sudbury, Massachusetts. Sarah and Josh continued to be denied the right to the care, custody, and control of C.S. 2 and C.S. 1.

### The Emergency Custody Hearing and aftermath

96.     DCF made no attempt to obtain a warrant or to justify the continued seizure of the Sabey children on Saturday, Sunday, or when the court opened on Monday morning.

97.     At about 4:15 p.m. on July 18, nearly three days after the warrantless removal of the Sabey children from their home and parents—and just 15 minutes before the court closed for the day—DCF filed a petition with the Cambridge Juvenile Court seeking permission to continue its custody of C.S. 1 and C.S. 2.

98.    The court granted the DCF petition, gave emergency custody of C.S. 2 and C.S. 1 to DCF, and scheduled a temporary custody hearing.

99.    Beginning August 8, the temporary custody hearing lasted three days. At the conclusion of the hearing, temporary custody of the children was returned to Josh and Sarah, subject to conditions. DCF, however, continued its investigation.

100.    During nearly four months of investigation, DCF failed to uncover any evidence of abuse, neglect, or maltreatment that justified their initial unlawful seizure of the children or their continued denial of full parental rights to the Sabeys. Nevertheless, DCF made no attempt to return full custody to the Sabeys for three months after they were awarded temporary custody.

101.    On November 15, 2022, the Cambridge Juvenile Court dismissed the DCF petition, restoring full custody to Sarah and Josh.

## CLAIMS FOR RELIEF

### First Cause of Action

**Unreasonable search and seizure of the Sabey house and curtilage in violation of the Fourth and Fourteenth Amendments**

**(Against individual Defendants)**

102.    Plaintiffs incorporate herein the allegations from the preceding paragraphs.

103.   Plaintiffs Joshua Sabey, Sarah Perkins, C.S. 1, and C.S. 2 bring this claim pursuant to 42 U.S.C. § 1983 alleging unreasonable search and seizure of their house and curtilage in violation of the Fourth and Fourteenth Amendments.

104.   The actions of Defendants were taken under color of state law.

105.   The Fourteenth Amendment to the U.S. Constitution protects Plaintiffs from unreasonable searches and seizures of their house and its curtilage by state or local officials, as it incorporates the rights guaranteed by the Fourth Amendment.

106.   The warrantless search or seizure of a house and curtilage is unconstitutional in the absence of consent or exigent circumstances.

107.   Defendants effected a search and seizure of Plaintiffs' house and its curtilage by physical trespass, threat of physical coercion, and a show of force to which Plaintiffs yielded as described above.

108.   Plaintiffs did not consent to the search or seizure of their house or curtilage.

109.   Because no judicially recognized warrant exception justified the warrantless search or seizure of Plaintiffs' house and curtilage, Defendants violated Plaintiffs' right to be free from unreasonable searches and seizures of their house as secured by the U.S. Constitution.

110.   Defendants acted intentionally and in reckless disregard of Plaintiffs' right to be secure in their house and curtilage against unreasonable searches and seizures.

111.   Defendants were plainly incompetent in their failure to secure a warrant before searching or seizing Plaintiffs' house and curtilage in the absence of a judicially recognized warrant exception.

112.   As a proximate result of Defendants' actions and inactions, Plaintiffs suffered and continue to suffer from emotional distress, mental anguish, and loss of personal liberty, privacy, and security.

113.   Plaintiffs are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs from Defendants.

## Second Cause of Action

### Unreasonable seizure of C.S. 2 and C.S. 1 in violation of the Fourth and Fourteenth Amendments

### (Against individual Defendants)

114.   Plaintiffs incorporate herein the allegations from the preceding paragraphs.

115.   Plaintiffs C.S. 2 and C.S. 1, through their parents, Joshua Sabey and Sarah Perkins, bring this claim pursuant to 42 U.S.C. § 1983 alleging unreasonable seizure of their persons in violation of the Fourth and Fourteenth Amendments.

116.   The actions of Defendants were taken under color of state law.

117.   The Fourteenth Amendment to the U.S. Constitution protects C.S. 2 and C.S. 1 from unreasonable seizures by state or local officials, as it incorporates the rights guaranteed by the Fourth Amendment.

118.   The custodial seizure of a person is unconstitutional in the absence of a warrant or a judicially recognized warrant exception.

119.   Because no judicially recognized warrant exception justified the warrantless seizures of C.S. 1 and C.S. 2 from their home, Defendants violated C.S. 1's and C.S. 2's right to be free from unreasonable seizures of their persons.

120.   Defendants acted intentionally and in reckless disregard of C.S. 1's and C.S. 2's rights.

121.   Defendants were plainly incompetent in their failure to secure a warrant before seizing C.S. 1 and C.S. 2 in the absence of any judicially recognized warrant exception.

122.   As a proximate result of Defendants' actions and inactions, C.S. 2 and C.S. 1 suffered and continue to suffer from emotional distress, mental anguish, and loss of personal liberty, privacy, and security.

123.   Plaintiffs are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs from Defendants.

**Third Cause of Action**

**Deprivation of parental rights without due process in violation of the Fourteenth Amendment**

**(Against individual Defendants)**

124.   Plaintiffs incorporate herein the allegations from the preceding paragraphs.

125.   Plaintiffs Joshua Sabey and Sarah Perkins bring this claim pursuant to 42 U.S.C. § 1983 alleging deprivation of their parental rights to the care, custody, and control of C.S. 2 and C.S. 1 without due process of law under the Fourteenth Amendment to the U.S. Constitution.

126.   The actions of Defendants were taken under color of state law.

127.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals from being deprived of their parental rights by state or local officials without due process of law.

128.   The right of a parent to direct the care, custody, and control of their child is a fundamental liberty secured by common law and by the U.S. Constitution.

129.   The Due Process Clause of the Fourteenth Amendment requires that a person be first given notice and an opportunity to be heard before a neutral decisionmaker prior to being deprived of a fundamental liberty.

130.   Massachusetts law requires that parents be provided notice and an opportunity to be heard before a neutral decisionmaker prior to having their rights

to the care, custody, and control of their children deprived in the absence of an imminent danger to the health or safety of their children.

131.   Defendants removed Joshua Sabey's and Sarah Perkins's children from their care, custody, and control, as described herein, without first providing them with notice and an opportunity to be heard before a neutral decisionmaker in a fair hearing concerning Plaintiffs' deprivation of their parental rights.

132.   Because Plaintiffs' parental rights were abrogated by the seizure of their children from their family home without prior notice or an opportunity to be heard before a neutral decisionmaker, Defendants violated Plaintiffs' right to due process of law under the Due Process Clause of the Fourteenth Amendment.

133.   Defendants acted intentionally and in reckless disregard of Plaintiffs' right to due process of law.

134.   Defendants were plainly incompetent in their failure to provide notice and an adversarial hearing before a neutral decisionmaker to Plaintiffs before removing their children, pursuant to a judicial order, from their care, custody, and control in the absence of an imminent danger to the health and safety of their children.

135.   As a proximate result of Defendants' actions and inactions, Plaintiffs suffered and continue to suffer from emotional distress, mental anguish, and loss of parental rights and family privacy.

136.   Plaintiffs are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs from Defendants.

### Fourth Cause of Action

### *Monell* claim for violations of the Fourth and Fourteenth Amendments
### (Against City of Waltham)

137.   Plaintiffs incorporate herein the allegations from the preceding paragraphs.

138.   Plaintiffs Joshua Sabey, Sarah Perkins, C.S. 1, and C.S. 2 bring this claim pursuant to 42 U.S.C § 1983 against Defendant City of Waltham, which, through its agents, violated the right of Plaintiffs to be secure in their house and its curtilage against unreasonable searches and seizures under the U.S. Constitution's Fourth and Fourteenth Amendments .

139.   The deprivations of Plaintiffs' rights were caused by the policies, customs, and established practices, including inadequate training, of the City of Waltham, acting under color of its statutory and legal authority.

140.   The City of Waltham directs and/or ratifies the entry and/or search of homes by force or threat of force without a warrant or a judicially recognized exception to the warrant requirement.

141.   The City of Waltham maintains and implements a custom, policy, and practice of entering and/or searching homes by force, threat, or show of force without a warrant or a judicially recognized exception to the warrant requirement.

142.   The City of Waltham fails to train and supervise its officers, despite the foreseeable consequences of such failure, on the constitutional requirement of obtaining a warrant prior to using force or the threat of force to enter and/or search a home in the absence of a judicially recognized exception to the warrant requirement.

143.   These directions, ratifications, customs, policies, practices, and/or failures to train and supervise were formed and executed with deliberate indifference to the Fourth and Fourteenth Amendments right to be secure in houses and persons against unreasonable searches and seizures.

144.   These directions, ratifications, customs, policies, practices, and/or failures to train and supervise were the moving force in the constitutional violations inflicted by the individual Defendants upon Plaintiffs.

145.   No reasonable person or officer could have concluded that there was an imminent danger to the health or safety of C.S. 2 or C.S. 1, nor any other exigency justifying force and/or threat of force to enter and search the Sabey home.

146.   As a direct and proximate result of the unconstitutional acts of Defendant City of Waltham, through its officers, Plaintiffs sustained violations of their rights under color of state law and, as a result, are entitled to compensatory damages and reasonable attorneys' fees and costs.

**Fifth Cause of Action**

***Monell* Claim for violation of parents' rights to due process**

**(Against City of Waltham)**

147.   Plaintiffs   incorporate   herein   the   allegations   from   the   preceding paragraphs.

148.   Defendant   City,   through   its   agents,   violated   the   right   of   Plaintiffs Joshua Sabey and Sarah Perkins to due process of law by depriving them of the right to the care, custody, and control of their children, C.S. 2 and C.S. 1, without first providing them with notice and a fair hearing before a neutral decisionmaker under the Fourteenth Amendment and 42 U.S.C. § 1983.

149.   Defendant   City,   through   its   agents,   violated   Massachusetts   law   and consequently Plaintiffs' due process rights under color of state law, as described herein, by removing Plaintiffs' children without a noticed fair hearing and in the absence of an imminent danger to the health or safety of C.S. 2 or C.S. 1.

150.   These   deprivations   were   caused   by   the   policies,   customs,   and established practices, including inadequate training, of the City of Waltham.

151.   These   directions,   ratifications,   customs,   policies,   practices,   and/or failures to train and supervise were formed and executed with deliberate indifference to the Fourteenth Amendment right to due process of law.

152.   The WPD, a department of Defendant City, regularly has its officers remove children from families in conjunction with DCF and its officials.

27

153. Officers of the WPD should have been aware that it was unconstitutional to take children from their parents' care, custody, and control without first providing those parents with notice and an opportunity to be heard before a neutral decisionmaker or an objective danger of imminent harm to the children.

154. Defendant City has therefore (1) failed to train its officers that procedural due process requires adherence to relevant statutory and regulatory policies, which require notice and an opportunity to be heard or an objective danger of imminent bodily harm to the child, and/or (2) administered a custom or policy that is deliberately indifferent to the due process rights of parents.

155. As a direct and proximate result of the unconstitutional acts of Defendant City of Waltham, Plaintiffs sustained violations of their rights under color of state law as described herein and, as a result, are entitled to compensatory damages and reasonable attorneys' fees and costs.

### Sixth Cause of Action

**Unreasonable search and seizure of the Sabey home and curtilage in violation of Article Fourteen of the Massachusetts Declaration of Rights**

**(Against individual Defendants)**

156. Plaintiffs incorporate herein the allegations from the preceding paragraphs.

157.   Plaintiffs Joshua Sabey, Sarah Perkins, C.S. 1, and C.S. 2 bring this claim pursuant to Mass. Gen. Laws chapter 12, §§ 11H and 11I, alleging unreasonable search and seizure of their house and curtilage in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and Article Fourteen of the Massachusetts Declaration of Rights.

158.   The Fourteenth Amendment to the U.S. Constitution protects Plaintiffs from unreasonable searches and seizures by state or local officials, as it incorporates the rights guaranteed by the Fourth Amendment.

159.   Article Fourteen of the Massachusetts Declaration of Rights protected Plaintiffs from unreasonable searches and seizures of their persons, houses, papers, and possessions.

160.   Defendants interfered with the exercise and enjoyment of Plaintiffs' rights under the U.S. Constitution and Massachusetts Declaration of Rights by physical means and threats, intimidation, and coercion.

161.   As a proximate result of Defendants' actions and inactions, Plaintiffs suffered and continue to suffer from emotional distress, mental anguish, and loss of personal liberty, privacy, and security.

162.   Plaintiffs are entitled to compensatory damages, as well as reasonable attorneys' fees and costs, from Defendants under Mass. Gen. Laws chapter 12, §§ 11H, 11I.

**Seventh Cause of Action**

**Unreasonable seizure of C.S. 2 and C.S. 1 in violation of Article Fourteen of the Massachusetts Declaration of Rights**

**(Against individual Defendants)**

163.   Plaintiffs incorporate herein the allegations from the preceding paragraphs.

164.   Plaintiffs C.S. 2 and C.S. 1, through their parents, Joshua Sabey and Sarah Perkins, bring this claim pursuant to Mass. Gen. Laws chapter 12, §§ 11H and 11I, alleging unreasonable seizure of their persons in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and Article Fourteen of the Massachusetts Declaration of Rights.

165.   The Fourteenth Amendment to the U.S. Constitution protects C.S. 2 and C.S. 1 from unreasonable seizures by state or local officials, as it incorporates the rights guaranteed by the Fourth Amendment.

166.   Article Fourteen of the Massachusetts Declaration of Rights protected C.S. 2 and C.S. 1 from unreasonable seizures of their person.

167.   Defendants interfered with the exercise and enjoyment of C.S. 2's and C.S. 1's rights under the U.S. Constitution and Massachusetts Declaration of Rights by physical means and threats, coercion, and intimidation.

168.   As a proximate result of Defendants' actions and inactions, C.S. 2 and C.S. 1 suffered and continue to suffer from emotional distress, mental anguish, and loss of personal liberty, privacy, and security.

169.   Plaintiffs are entitled to compensatory damages, as well as reasonable attorneys' fees and costs, from Defendants under Mass. Gen. Laws chapter 12, §§ 11H, 11I.

**Eighth Cause of Action**

**Violation of the Massachusetts Privacy Act**

**(Against individual Defendants)**

170.   Plaintiffs incorporate herein the allegations from the preceding paragraphs.

171.   Plaintiffs Joshua Sabey, Sarah Perkins, C.S. 2, and C.S. 1 bring this claim pursuant to Mass. Gen. Laws chapter 12, §§ 11H and 11I, alleging interference with the exercise or enjoyment of their right to privacy under Mass. Gen. Laws chapter 214, § 1B.

172.   Through their actions related to the seizure of C.S. 2 and C.S. 1, Defendants violated Plaintiffs' right against unreasonable, substantial, or serious interference with their privacy.

173.   Defendants intentionally and unreasonably intruded on Plaintiffs' seclusion, solitude, and private affairs.

174.   Defendants' actions constituted a substantial and serious interference with Plaintiffs' privacy.

175.   Defendants' actions were highly offensive to Plaintiffs and would have been highly offensive to any reasonable person.

176.   Defendants lacked a competing interest or legitimate purpose that would justify their intrusion on Plaintiffs' privacy.

177.   Plaintiffs suffered emotional distress, mental anguish, and loss of parental rights and family privacy as a direct result of Defendants' actions.

178.   Plaintiffs are entitled to compensatory damages and the award of reasonable attorneys' fees and costs from Defendants under Mass. Gen. Laws chapter 214, § 1B and Mass. Gen. Laws chapter 12, §§ 11H, 11I.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that this Court enter judgment in their favor and grant the following relief:

1.   Compensatory and punitive damages against each of the Defendants in an amount to be determined at trial;

2.   Reasonable costs and expenses, including attorneys' fees; and

3.   Such other relief as this Court deems just and proper.

DATED: May 2, 2023.

Respectfully submitted,

_/s/_ Jonathan M. Houghton

Jonathan M. Houghton, BBO# 641688
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
jhoughton@pacificlegal.org

Joshua P. Thompson, Cal. Bar No. 250955*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
jthompson@pacificlegal.org

Daniel T. Woislaw, Va. Bar No. 91180*
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
dwoislaw@pacificlegal.org

Glenn E. Roper, Col. Bar No. 38723*
1745 Shea Center Dr., Suite 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
geroper@pacificlegal.org

*Counsel for Plaintiffs*

*\*Pro Hac Vice applications forthcoming*