# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
JOSHUA SABEY, SARAH PERKINS,        )
JOSHUA SABEY and SARAH PERKINS on   )
behalf of C.S. 1 and C.S. 2,        )
minors,                             )
                                    )
                Plaintiffs,         )
                                    )   Civil Action
v.                                  )   No. 23-10957
                                    )
KATHERYN BUTTERFIELD, AARON         )
GRIFFIN, CAROLYN KALVINEK,          )
BONNIE ARRUDA, ANTHONY SCICHILONE,  )
RICHARD COUTURE, ELIAS MAKRIGIANIS, )
STEFANO VISCO, and CITY OF WALTHAM, )
MASSACHUSETTS,                      )
                                    )
                Defendants.         )
_____)
```

## MEMORANDUM AND ORDER

March 14, 2024

Saris, D.J.

Joshua Sabey and Sarah Perkins are the parents of two young children who were removed from their home at 1:00 A.M. on a Saturday morning by the Massachusetts Department of Child and Family Services ("DCF") with the assistance of police officers from the City of Waltham. The forced removal took place without a warrant three days after an emergency room doctor discovered that the youngest child had two healing rib fractures, the cause of which was uncertain. Sabey and Perkins, individually and on behalf of their two children, brought suit against the City of Waltham,

the four police officers who were present at the removal, and the DCF employees involved in the removal in their personal capacities. Both the DCF Defendants and the City of Waltham have moved to dismiss. After review of the briefing and oral argument, the Court **ALLOWS** the City of Waltham's Motion to Dismiss (Dkt. 39) and **ALLOWS** the DCF Defendants' Motion to Dismiss (Dkt. 30) with respect to Count VIII only; the latter motion is otherwise **DENIED**.

**BACKGROUND**

The facts below are taken from the Complaint and are assumed to be true.

## I.   Hospital Visit on July 12-13, 2022

At the time of the events, the older child ("C.S. 1") was three years old and the younger child ("C.S. 2") was three months old. On July 12, 2022, C.S. 2 began vomiting and developed a fever. At around 2:00 A.M., Perkins took him to the emergency room at Newton Wellesley Hospital with a 103.5 degree fever. Sabey remained home with C.S. 1. At the hospital, it was determined that C.S. 2 had low oxygen levels and a respiratory infection. In order to check his lungs for possible pneumonia, C.S. 2 was given an x-ray.

The x-ray revealed a healing rib fracture, which was estimated to be between ten days and six weeks old. This discovery prompted an internal hospital investigation. Perkins was informed of the fracture at 8:00 A.M. on July 13, and was questioned about the source of the injury. She responded that neither she nor her

husband knew about the rib fracture and did not know what could have caused it. The hospital then ordered more detailed imaging and further testing of C.S. 2, including a full skeletal exam, which showed that the rib injury actually comprised two adjacent healing rib fractures. The hospital requested permission to conduct a brain scan, which Perkins initially declined. The brain scan did not reveal any cause for concern.

As part of the hospital investigation, social worker Jill Saks conducted interviews with Perkins at the hospital that day. When pressed by the social worker to speculate, Perkins suggested that the injuries may have been caused by C.S. 2's short fall from bed several weeks before, which had not resulted in any apparent injury. Perkins denied any physical or substance abuse in the home. Hospital officials also spoke with the family's pediatrician, Dr. Kristen Haddon, who reported that she had no concerns about C.S. 2's safety and well-being. At the hospital's request, C.S. 1 was brought to the pediatrician to be medically cleared. After a thorough examination, the pediatrician found no signs of abuse, mistreatment, or injury. That same day, the social worker sent a report to DCF alleging physical abuse of C.S. 2 by his parents. The report outlined the injuries to C.S. 2's ribs and stated that Perkins's "affect" was "flat" and that she "rolled her eyes" when questioned. The report also indicated that the rib fractures were not consistent with a fall from a bed.

Shortly after receiving the report from the hospital, DCF sent emergency response workers Axel Rivera and Ana Piedade to the hospital to further investigate whether there were indications of abuse or neglect. The hospital officials informed them that, with the exception of the rib fractures, there were no signs of physical abuse, no signs of substance abuse, and that the family's pediatrician had told hospital officials that she had no concerns about the children's wellbeing. After speaking with hospital officials, Rivera and Piedade individually interviewed Sabey, Perkins, and C.S. 1. After the interviews, Sabey and C.S. 1 returned home while Perkins and C.S. 2 were required to stay at the hospital overnight. That night, Piedade and Rivera went to the family's home in Waltham, where they reported no concerns.

## II.   **The Investigation Continues on July 14-15**

The next morning, at about 9:30 A.M. on July 14, Rivera spoke with Dr. Haddon. Dr. Haddon reported no concerns and was surprised to hear of the injuries. Additionally, Dr. Haddon told Rivera that C.S. 2 was medically up to date and that his parents take him to monthly pediatrician visits, none of which had revealed any concerns of abuse, injury, or neglect. In addition to speaking with the family's pediatrician, Rivera also spoke with Dr. David Dominguez, who had completed the medical clearance on C.S. 1 the previous day. Dr. Dominguez reported no concerns with C.S. 1. Rivera also contacted the Waltham Police Department to request

background checks on Sabey and Perkins. Their background checks showed that there had been no police calls to the home and revealed no concerns with either parent.

At about 3:00 P.M. on July 14, DCF officials allowed Perkins and C.S. 2 to leave the hospital and return home. That same day, around 5:00 P.M., Rivera spoke with Sabey over the phone about a safety plan for the family, which he subsequently emailed. The family agreed to sign the safety plan and to have a home visit on July 18.

Defendant Katheryn Butterfield, an Area Program Manager for DCF, was informed of the C.S. 2 investigation the following day, July 15. Soon after learning of the investigation, Butterfield ordered Rivera to go to the Sabey home and to provide her with an update after the visit. At about 5:15 P.M. that day, Rivera conducted an unannounced home visit. He spoke with the family, observed both children, and ultimately reported no concerns. Rivera reported that C.S. 1 "was walking around and was smiling," while C.S. 2 "looked presentable" while being held by his visiting grandmother. Dkt. 1 at 11. During this unannounced home visit, Rivera and the family agreed to also move forward with the previously scheduled July 18 home visit.

**III.  Removal of the Two Children**

At 6:00 P.M. that same day, a Friday, after receiving confirmation from Rivera that he had completed his unannounced

visit to the home, Butterfield made the decision to remove the children from the home. She made this determination based on the hospital's discovery of C.S. 2's healing rib fractures and not on any new evidence or information found during DCF's investigation. At approximately 8:00 P.M., Defendant Butterfield called Defendant Aaron Griffin, a supervisor with DCF, to discuss a plan for the removal. About an hour later, at 9:00 P.M., Defendants Carolyn Kalvinek and Bonnie Arruda, officers with DCF, were contacted and asked to proceed with the removal of the children from the home. After a conversation with Defendant Griffin to gather more information about the case and removal plan, Defendants Kalvinek and Arruda went to the Waltham Police Department ("WPD") station at around 12:30 A.M. to request assistance in removing the Sabey children. At approximately 1:00 A.M., Kalvinek and Arruda from DCF, together with three police officers from WPD -- Defendants Anthony Scichilone, Elias Makrigianis, and Stefano Visco -- arrived at the Sabey home.

The Sabey home was a rented ground-floor apartment in a shared building. It shared a common entryway, or breezeway, with a closed outer front door that faced the street and was usually locked. The family accessed their apartment through this front door since their apartment door was located just inside the front door within the breezeway. The stairs within the breezeway led to the upstairs tenants' apartment, but those tenants rarely used the front door

and preferred to enter their unit through a separate external door. As a result, the family used the breezeway as an extension of their home, often locking the outer door and using the space to store personal property, such as car seats and strollers.

When the DCF and WPD officers arrived at the Sabey home, the police officers, Defendants Makrigianis and Visco, opened and entered through the outer front door into the breezeway. While standing within the breezeway, Defendant Makrigianis knocked on the inner door to the home. Sabey answered the inner door and asked the officials if they had a warrant; they informed him they did not. In response, Sabey refused to allow the DCF workers and WPD officials to enter the apartment, telling them to leave and return with a warrant or other court order. The officials remained on the property, including the breezeway, despite Sabey's repeated requests that they leave and return with a warrant or other court order. One police officer stood against the front outer door, intentionally jutting his elbow into the threshold to prevent any attempt to close the outer door. Another officer stood on the bottom step of the stairs within the breezeway, flanking the door to the home on the left.

Eventually, the police officers told the family that DCF was taking emergency custody of both children. None of the officials had any paperwork on them. Instead, they claimed repeatedly (and falsely) to have an "emergency order" that authorized them to take

the children. Dkt. 1 at 16. Concerned about the lack of paperwork, Defendant Scichilone contacted his supervisor, Defendant Richard Couture, to seek guidance about the removal. Sabey called the family's lawyer, who then spoke with Defendant Couture and other officials from DCF and WPD. Defendant Couture and WPD officers informed the lawyer that if the parents did not surrender the children, then the officers would break into the home and seize the children by force. Faced with this alternative, the parents woke their children up and placed them, crying, into the DCF vehicle.

After removing the children at about 2:30 A.M. on Saturday, July 16, Defendants Kalvinek and Arruda placed them in the care of a foster parent. Later that day the children were placed in the care of their paternal grandparents.

The following Monday, July 18, at approximately 4:15 P.M., almost three days after the removal of the Sabey children from the home, DCF filed a petition with the Juvenile Court seeking permission to continue its custody of both C.S. 1 and C.S. 2. The court granted that petition, gave emergency custody of the children to DCF, and scheduled a temporary custody hearing.

The temporary custody hearing began on August 8, and lasted three days. At the conclusion of the hearing, temporary custody of the children was returned to their parents, subject to conditions. DCF proceeded with an almost four-month investigation, which

ultimately failed to uncover any evidence of abuse, neglect, or maltreatment of the children by their parents. For the next three months the parents did not have full custody of their children.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the factual allegations in a complaint must "possess enough heft" to set forth "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 559 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addressing a motion to dismiss, the Court must accept all allegations in the complaint as true except legal conclusions. Id.

A preliminary issue is whether the Court should consider DCF's "Section 51B" investigative report of Sabey and Perkins, which was not annexed to the Complaint but was referenced in it. Defendants argue that the report, and certain audio recordings, should be considered. A court may consider the allegations contained in the complaint and materials "fairly incorporated into the complaint." Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 12 (1st Cir. 2004). Defendants point out that the Complaint refers to information in the report, particularly with respect to the sequence of events.

They ask the Court to consider the eighteen-page report in its entirety, including conclusions by DCF that the injuries were non-accidental. Though the report will likely be considered at summary judgment, I do not agree that it was fairly incorporated in its entirety into the Complaint. Defendants' reliance on Goodall v. Worcester School Committee is misplaced because the District Court there ultimately declined to rely on the extraneous exhibits. 405 F. Supp. 3d 253, 259-60 (D. Mass. 2019).

**DISCUSSION**

**I.   Claims Against DCF Defendants in Violation of Fourth and Fourteenth Amendments (Count I)**

Plaintiffs allege in Count I that the DCF Defendants conducted an unreasonable search and seizure of their house and curtilage in violation of the Fourth and Fourteenth Amendments. They assert there were no exigent circumstances justifying the warrantless entry, that they did not consent to the search, and the entry was by threat of force. The DCF Defendants argue that exigent circumstances justified the warrantless entry.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The core of the Fourth Amendment is the right of a family to retreat into their own home and "there be free from unreasonable governmental intrusion." Florida v. Jardines, 569

U.S. 1, 6 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)) ("But when it comes to the Fourth Amendment, the home is first among equals"). Absent exigent circumstances, the threshold of a home "may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). This protection includes the "curtilage" which is the area "immediately surrounding and associated with the home." Collins v. Virginia, 584 U.S. 586, 592 (2018) (quoting Jardines, 569 U.S. at 6). The "Fourth Amendment requires government officials, including social workers, who go to a home to investigate reported child abuse or neglect allegations for the purpose of assuring the well-being of the child to obtain a warrant unless an exception to the warrant requirement applies." Goodall, 405 F. Supp. 3d at 273 (citing Andrews v. Hickman Cnty., 700 F.3d 845, 861 (6th Cir. 2012)).

The exigent circumstances exception to the warrant requirement applies when the exigency of the situation makes the need of law enforcement so compelling that a warrantless search is "objectively reasonable." Lange v. California, 141 S. Ct. 2011, 2017 (2021). For example, an officer may enter a home without a warrant to render emergency assistance to an injured occupant. Id. The exigent circumstances exception must be analyzed on a case-by-case basis by looking at the "totality of circumstances" confronting the officer. Id. at 2018.

In addition to the exigency exception, the First Circuit has held that an officer's entry into a home may be exempted from the warrant requirement under the so-called "special need" exception. See McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996). In McCabe, the First Circuit permitted warrantless entry into a home when police officers executed a "pink paper," which is an order authorized by a licensed psychiatric physician for involuntary commitment for a medical psychiatric examination. Where there is an "important administrative or regulatory purpose . . . which would be undermined systematically by an impracticable warrant or probable-cause requirement," no warrant is necessary. Id. However, the First Circuit has declined to extend the special need exception beyond the "pink sheets" context. See Hill v. Walsh, 884 F.3d 16, 22 n.2 (1st Cir. 2018).

Defendants' reliance on Wilmot v. Tracey is misplaced. In Wilmot the Court rejected a Fourth Amendment challenge to the warrantless entry into a home by DCF. 938 F. Supp. 2d 116, 128 (D. Mass. 2013) (involving a family member alleging ongoing physical and sexual child abuse). The key distinction is that the wife consented to entry of DCF. Id. at 137-38. Moreover, the court found that the warrantless entry into the home fell within the exigent circumstances exception because of the information of past and ongoing abuse. Id. at 138.

Here, Plaintiffs allege they did not consent and the entry at 1:00 A.M. was by threat of force. Though the youngest child was found to have two rib fractures, the injuries here were not new and were healing. The DCF investigation revealed that the children's pediatrician had no concerns about either child. The parents were cooperative at the home visit and the children seemed happy. Importantly, there was no warrant or court order –- and plenty of time to get one. When all reasonable inferences are drawn in favor of the moving party, Plaintiffs state a viable Fourth Amendment claim.

As a backstop, the DCF officers contend that they are not liable for the alleged search and seizure because it was the police officers, not they, who entered the property. However, the First Circuit has held that in such circumstances liability may arise through a joint tortfeasor theory when each defendant has "intentionally engaged in a series of acts that would foreseeably result in some member of the team inflicting constitutional injury." Eldrege v. Town of Falmouth, 662 F.3d 100, 105-06 (1st Cir. 2011). According to the Complaint, the decision to remove the children was a team effort. It was made in the first instance by Defendant Butterfield. She discussed the case and the process of removal with Defendant Griffin, who in turn discussed the removal with Defendants Kalvinek and Arruda. Kalvinek and Arruda appeared with WPD officers at Plaintiffs' home without a warrant at 1:00

A.M. and took the children without a court order. At the very least, these alleged actions are enough to give rise to a plausible inference that each of the DCF Defendants understood that their affirmative actions would foreseeably result in a violation of the family's Fourth Amendment rights.

## II. Unreasonable Seizure of the Children in Violation of the Fourth Amendment (Count II) and Deprivation of Parental Rights in Violation of Fourteenth Amendment (Count III)

The DCF Defendants move to dismiss Count II for unreasonable seizure of the children and Count III for deprivation of parental rights in violation of the Fourteenth Amendment.

"The interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution." Hatch v. Dep't for Child., 274 F.3d 12, 20 (1st Cir. 2001) (citing Troxel v. Granville, 530 U.S. 57, 65 (2000)). "As such, it is protected by the Due Process Clause." Id. However, "[i]n cases where the safety of the child is at risk, there are competing liberty interests, and so the parents' rights are not absolute." Suboh v. Dist. Att'y's Off., 298 F.3d 81, 91 (1st Cir. 2002).

Generally, "the question of what process is due involves a weighing of the different interests of the child, the parents, and the state." Id. at 92 (citing Hatch, 274 F.3d at 20). Accordingly, "[d]ue process protects a parent's rights even when a state temporarily removes a child before obtaining a court order," and

"the state may place a child in temporary custody only when it has evidence giving rise to a suspicion that the child has been abused or is in imminent danger." Id.

Defendants argue that DCF had a reasonable basis for believing removal was necessary. By statute, DCF may take a child into temporary custody when it "has reasonable cause to believe that removal is necessary to protect a child from abuse or neglect." Mass. Gen. Laws ch. 119, § 51B(e). By regulation, a "child may be immediately taken into custody if, after viewing the child, the Department's response worker finds reasonable cause to believe . . . [t]he nature of the emergency is such that there is inadequate time to seek a court order for removal." 110 Mass. Code Regs. § 4.29(2).

Here, an emergency physician diagnosed two broken ribs in a three-month-old boy. The ribs had been broken days or weeks before and were healing. The pediatrician saw no signs of abuse in either child. Defendants point to information in the 51B report which supported a reasonable suspicion that the broken ribs were a sign of child abuse in the three-month-old, but this information is outside the four corners of the Complaint and more properly addressed at summary judgment. Moreover, there is no information about child abuse concerning the three-year-old. When all reasonable inferences are drawn in Plaintiffs' favor, the

Complaint states a plausible claim that DCF Defendants lacked a reasonable suspicion of child abuse.

### III.  Claims Against DCF Defendants Alleging Violation of Article 14 of the Massachusetts Declaration of Rights (Counts VI, VII)

Plaintiffs assert constitutional claims under state law: Count VI (unreasonable search and seizure of the house and curtilage in violation of the Massachusetts Declaration of Rights) and Count VII (unreasonable seizure of the children in violation of the Massachusetts Declaration of Rights). To state a claim under state law, plaintiffs must plausibly allege that there was interference of their rights through "threats, intimidation, or coercion," which Defendants argue the Complaint fails to do. Bally v. Ne. Univ., 532 N.E.2d 49, 51-52 (Mass. 1989).

As alleged in the Complaint, Plaintiffs only handed their children over to DCF after being told that if they refused to do so, the children would be taken by force. Accordingly, Counts VI and VII have been adequately pled.

### IV.  Qualified Immunity

"Determining whether qualified immunity is available to a particular defendant at a particular time requires a trifurcated inquiry." Hatch, 274 F.3d at 20. First, it must be determined "whether the plaintiff has alleged the violation of a constitutional right." Id. Next, if a constitutional right violation is identified, then the Court evaluates "whether the

contours of the right were sufficiently established at the time of the alleged violation." Id. This step consists of two sub-questions: the Court must determine whether (1) "the contours of the right, in general, were sufficiently clear," and (2) if, under the specific facts of the case, an objectively reasonable official would have believed that the action taken or omitted violated the right at issue. Hunt v. Massi, 773 F.3d 361, 367 (1st Cir. 2014) (quoting Ford v. Bender, 768 F.3d 15, 23 (1st Cir. 2014)). These three inquiries are made in a sequence, "mindful that a single negative answer suffices to defeat the plaintiff's claim for damages." Hatch, 274 F.3d at 20.

Plaintiffs have alleged violations of constitutional rights that are sufficiently established, the contours of which are clear, and which a reasonable official would understand themselves to be violating if they engaged in the alleged conduct: the Fourth and Fourteenth Amendment right to be free of warrantless searches in the home and seizures absent exigent circumstance, a court order, warrant, or consent; and the Fourteenth Amendment right to due process before the State impinges on the right to family integrity. The Defendants vigorously assert that they had a reasonable belief that child abuse had occurred. However, the Court must draw all reasonable inferences in favor of Plaintiffs. Qualified immunity on all constitutional counts is more properly addressed at summary judgment when the court will consider a full record. Accordingly,

DCF Defendants' motion to dismiss Count I is **DENIED** without prejudice.

## V.   Claims Against DCF Defendants Alleging Violation of the Massachusetts Privacy Act

The Massachusetts Privacy Act provides parties with a private right of action to defend against "unreasonable, substantial or serious interference" with privacy. Mass. Gen. Laws ch. 214, § 1B. Defendants argue that this claim should be dismissed because (1) the DCF Defendants are protected by the common law doctrine of immunity, and (2) because the DCF Defendants did not engage in "unreasonable, substantial or serious" interference with Plaintiffs' rights.

Common law immunity is broader than qualified immunity. "At common law, . . . a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." Chaney v. City of Framingham, No. 18-10413, 2019 WL 6496842, at *7 (D. Mass. Dec. 3, 2019) (quoting Nelson v. Salem State Coll., 845 N.E.2d 338, 348 (Mass. 2006)). Though the Complaint alleges a substantial invasion of privacy, it does not allege that those violations were the result of bad faith, malice, or corruption. Accordingly, DCF Defendants' motion to dismiss Count VIII is **ALLOWED**.

## VII. <u>Monell Claims Against the City of Waltham for Violation of Due Process (Counts IV and V)</u>

Municipalities become liable for the constitutional violations of their employees when those violations are attributable to a custom or practice of the municipality. <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st Cir. 1989). Courts routinely require evidence of a pattern of similar past violations to support a municipal liability claim. <u>See</u> <u>Connick v. Thompson</u>, 563 U.S. 51, 62 (2011). When a <u>Monell</u> claim is pursued under a failure to train theory, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." <u>Id.</u> at 64.

The Complaint does not allege any specific facts suggesting that the City of Waltham has any policy, custom, or established practice of depriving persons of their constitutional rights through illegal searches and seizures of the home (Count IV) or by stripping them of their parental rights without due process (Count V). Plaintiffs argue that their <u>Monell</u> claims are well pled because the egregiousness of the alleged constitutional violations demonstrates that either the police were conforming with an unconstitutional policy or established practice, or that the City failed to train the officers to respect Plaintiffs' constitutional rights.

These arguments are unavailing. The violations alleged -- that the police officers, informed by DCF that there was reason for emergency removal, effectuated the removal -- do not rise to the level of egregiousness that has allowed courts to infer <u>Monell</u> liability in the absence of allegations of specific failures to train. <u>See, e.g.</u>, <u>Connick</u>, 563 U.S. at 63-64 (holding that a district attorney's office cannot be held liable under a § 1983 claim based on a single <u>Brady</u> violation). Accordingly, the City of Waltham's Motion to Dismiss Count IV and Count V (Dkt. 39) is **<u>ALLOWED</u>**.

**<u>ORDER</u>**

For the foregoing reasons, Defendants City of Waltham's Motion to Dismiss (Dkt. 39) is **<u>ALLOWED</u>**. The DCF Defendants' Motion to Dismiss (Dkt. 30) is **<u>ALLOWED</u>** with respect to Count VIII only, and is otherwise **<u>DENIED</u>**. The Court also denies the motion to dismiss based on qualified immunity.


SO ORDERED.

/s/ Patti B. Saris
Hon. Patti B. Saris
United States District Judge