UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
JOSHUA SABEY, SARAH PERKINS,   )
JOSHUA SABEY and SARAH PERKINS )
on behalf of C.S. 1 and C.S. 2,)
minors,                        )
                               )
               Plaintiffs,     )
                               )
v.                             )
                               )         Civil Action
KATHERYN BUTTERFIELD, AARON    )         No. 23-cv-10957-PBS
GRIFFIN, CAROLYN KALVINEK,     )
BONNIE ARUDA, ANTHONY          )
SCICHILONE, RICHARD COUTURE,   )
ELIAS MAKRIGIANIS, STEFANO VISCO, )
KEVIN O'CONNELL, and CANDICE   )
GEMSKI,                        )
                               )
               Defendants.     )
_____)
```

**MEMORANDUM AND ORDER**

March 13, 2026

Saris, J.

**INTRODUCTION**

At around 1:00am on Saturday, July 16, 2022, two social workers from the Massachusetts Department of Children and Families ("DCF") and police officers from the Waltham Police Department arrived at the apartment of Joshua Sabey, Sarah Perkins, and their young children C.S. 1 and C.S. 2, who were three years old and three months old, respectively. Their objective was to remove the children to the temporary custody of DCF due to suspicions of physical abuse to C.S. 2, who was discovered to have two healing

rib fractures during a visit to the Newton-Wellesley Hospital. They did not have a warrant, a court order, or any paperwork.

After more than an hour and a half of expressing their objections and facing a threat of force by the police, Sabey and Perkins turned over C.S. 1 and C.S. 2. A juvenile court granted temporary custody of the children to DCF two days later. But the allegations of child abuse never proved up, and several months later, Sabey and Perkins were restored full custody of the children.

Sabey and Perkins on behalf of themselves and C.S. 1 and C.S. 2 ("Plaintiffs") now bring various constitutional and state-law claims regarding the removal of C.S. 1 and C.S. 2. Plaintiffs' claims are brought against ten state officials in their individual capacities ("Defendants"). Five of the Defendants are DCF employees (the "DCF Defendants"): Candice Gemski, Katheryn Butterfield, Aaron Griffin, Bonnie Arruda, and Carolyn Kalvinek. The other five Defendants are Waltham Police Department officers (the "Police Defendants"): Kevin O'Connell ("Chief O'Connell"), Richard Couture ("Lieutenant Couture"), Anthony Scichilone ("Sergeant Scichilone"), Elias Makrigianis ("Officer Makrigianis"), and Stefano Visco ("Officer Visco").

Now before the Court are the parties' cross-motions for summary judgment. Although the Court finds that several Defendants violated Plaintiffs' constitutional rights, most of the Defendants

are entitled to summary judgment under the doctrine of qualified immunity. However, a genuine dispute of material fact precludes granting summary judgment on the Fourth Amendment claim of unlawful seizure asserted by C.S. 1 and C.S. 2 against Butterfield and Gemski. The Court therefore **DENIES** Plaintiffs' motion for summary judgment (Dkt. 205); **ALLOWS** Chief O'Connell's motion for summary judgment (Dkt. 199); **ALLOWS** Lieutenant Couture, Sergeant Scichilone, Officer Makrigianis, and Officer Visco's motion for summary judgment (Dkt. 201); **ALLOWS** Griffin, Arruda, and Kalvinek's motion for summary judgment (Dkt. 217); and **ALLOWS IN PART** and **DENIES IN PART** Butterfield and Gemski's motion for summary judgment (Dkt. 206).

**BACKGROUND**

## I.  **Factual Background**

When evaluating a summary judgment motion, courts "construe the relevant facts in the light most favorable to the non-moving party." Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024). The following facts are undisputed except where stated otherwise.

### A.  **The Hospital Visit**

Early in the morning on Wednesday, July 13, 2022, Perkins brought her three-month-old son, C.S. 2, to the Newton-Wellesley Hospital due to respiratory symptoms and a high fever. An x-ray revealed that C.S. 2 had two rib fractures. When asked about the

possible source of the fractures, Perkins stated that C.S. 2 had fallen from a bed two weeks before, but that she had decided not to seek medical care because C.S. 2 seemed uninjured and calmed quickly. The hospital's child protection team determined that C.S. 2's rib fractures were not consistent with a fall from a bed. Perkins initially declined to allow C.S. 2 to receive a brain MRI recommended by the hospital's child protection team but ultimately allowed the MRI to be conducted.

After learning of C.S. 2's injuries, Perkins asked Sabey to bring the couple's three-year-old son, C.S. 1, to the pediatrician to evaluate C.S. 1 for signs of abuse. Sabey did so, and the pediatrician discovered no evidence of abuse with respect to C.S. 1.

**B.    The DCF Investigation**

Later that day (Wednesday), Griffin was working as an on-call DCF supervisor overseeing DCF's emergency response workers. At 5:35pm, Griffin received an email attaching a 51A Report.[1] The 51A

---

[1] DCF's procedures for investigating suspected child abuse are governed, in large part, by Massachusetts statute. As relevant here, when specified persons -- including certain medical workers -- "have reasonable cause to believe that a child is . . . suffering physical or emotional injury resulting from abuse inflicted upon them which causes harm or substantial risk of harm to the child's health or welfare," Mass. Gen. Laws ch. 119, § 51A(a) (2022), those persons are statutorily required to send DCF a written "51A [R]eport," Wilmot v. Tracey, 938 F. Supp. 2d 116, 129 (D. Mass. 2013). The 51A Report must include, inter alia, information regarding "the nature and extent of the child's injuries, abuse, maltreatment or neglect." Mass. Gen. Laws ch. 119, § 51A(d).

Report included a summary from a social worker at the Newton-Wellesley Hospital describing the above information regarding C.S. 2's hospital visit. It also stated that when discussing C.S. 2's rib fractures with hospital staff, Perkins' "affect" was "very flat," and that when informed that hospital staff were concerned about the possibility that nonaccidental trauma had occurred and that a report was being filed, Perkins "rolled her eyes" and "had a lot of questions about when [DCF] would call her." Dkt. 209-24 at 3.

After reviewing the 51A Report, Griffin initiated an investigation which eventually resulted in the creation of a 51B Report.[2] Pursuant to DCF's investigation, at around 8:00pm that same Wednesday, DCF emergency response workers Axel Rivera and Ana

---

[2] Upon receiving a 51A Report, DCF must "investigate the suspected child abuse or neglect." Mass. Gen. Laws ch. 119, § 51B(a). DCF's investigation typically includes a "home visit," a "determination of the nature, extent and cause or causes of the injuries" to the child, a determination of the "identity of the person or persons responsible therefore," an inquiry into the conditions of "other children in the same household," and an "evaluation of the parents and the home environment." Id. § 51B(b). During and after its investigation, DCF develops a written "51B Report" which evaluates the child's home environment, assesses the extent of any risk posed to the child, and determines "whether the suspected child abuse or neglect is substantiated." Id. § 51B(a)-(b). If DCF "has reasonable cause to believe" that the child "is in immediate danger from abuse or neglect," DCF "shall take [the] child into immediate temporary custody" where "necessary to protect the child." Id. § 51B(c). After taking emergency temporary custody of a child, DCF supplements its 51B Report with the "reasons for such removal" and "file[s] a care and protection petition . . . on the next court day." Id.

Piedade visited the Newton-Wellesley Hospital, where C.S. 2 continued to receive treatment. At the hospital, Rivera and Piedade were informed by medical staff that C.S. 2's rib fractures were estimated to be between ten days and six weeks old and that there were signs of healing. Doctors further informed Rivera and Piedade that the fractures were not consistent with falling off a bed or with injuries sustained during childbirth; that diagnostic tests had ruled out underlying medical conditions as potential causes; and that the injuries appeared consistent with C.S. 2 being squeezed too tight or sustaining blunt force trauma. Rivera and Piedade were also told that Perkins had a "flat affect" and had initially refused an MRI. Dkt. 209-23 at 2. Additionally, Rivera and Piedade were informed that C.S. 2's pediatrician did "not have any concerns" and that Perkins and Sabey "appeared to be sober throughout the day." Id.

Rivera and Piedade then entered C.S. 2's hospital room. When they entered, Sabey "was holding [C.S. 2] and soothing him," while Perkins "was playing with [C.S. 1]." Id. C.S. 2 "was sleeping and appeared to be comfortable in [Sabey's] arms," and "Piedade did not view any visible marks and bruises" on C.S. 2. Id.

When asked about C.S. 2's injury, Sabey told Piedade that C.S. 2 had recently fallen off a bed, that Perkins had a difficult childbirth, and that C.S. 1 could sometimes be rough with C.S. 2, including "head-butt[ing]" C.S. 2 in one instance (though Sabey

6

denied that C.S. 1 was ever left alone with C.S. 2). Id. at 8. Perkins also stated that C.S. 2 had gotten stuck in the railings or slats of C.S. 1's bed two weeks prior. Sabey and Perkins did not bring C.S. 2 to a doctor after that incident because C.S. 2 was smiling and did not appear to be in pain.

Sabey denied any domestic violence and stated that he did "not believe in corporal punishment." Id. at 3. Similarly, when speaking to Rivera, Perkins denied any substance use, domestic violence, or prior interactions with the police. Rivera and Piedade were told that Sabey and Perkins were the primary caregivers for C.S. 1 and C.S. 2, that the children's grandparents lived outside of Massachusetts, and that the family was planning to move to Idaho in two weeks.

Piedade also interviewed C.S. 1 at the hospital. C.S. 1 said that sometimes C.S. 1 hurt C.S. 2 and made him cry, but that when C.S. 2 cried, Sabey and Perkins would "console him by feeding him and then he is fine." Id. at 4. C.S. 1 stated that everyone got along at home. He also denied any safety concerns at home.

After updating Griffin on the investigation, Rivera and Piedade inspected Plaintiffs' residence. They determined that C.S. 1's crib had "appropriate railings" and C.S. 2 had a bassinet. Id. They further noted that the "fridge had sufficient food" and "did not observe any concerns with the home condition." Id.

Following the home visit, Rivera also noted the following about C.S. 2's skeletal exam: "The impression is healing fractures . . . . Non accidental trauma is considered." Id. at 4-5. He also wrote that "no other fractures [were] identified." Id. at 5.

The next morning, Thursday, July 14, 2022, Griffin, Rivera, and Piedade met and decided to continue gathering information. Rivera called C.S. 1's and C.S. 2's pediatricians. The pediatrician who examined C.S. 1 the day before reported that there were "no injuries" to C.S. 1 and "no indications of anything concerning." Id. C.S. 1 had once been brought to the emergency room for second-degree burns on his stomach, but his parents had "brought him in appropriately and the child protection team was aware but no 51A [Report] was filed." Id. C.S. 2's pediatrician reported no concerns about C.S. 2's wellbeing, was "surprised" about the rib fractures, and stated that "there were no presented concerns" at C.S. 2's monthly examinations. Id.

A social worker at the Newton-Wellesley Hospital told Rivera that she and the hospital continued to have concerns, including because Perkins had a flat affect and did not ask many follow-up questions about C.S. 2's injuries. The social worker sent Rivera a medical addendum authored by an attending physician, which said that C.S. 2's injuries had high specificity for nonaccidental trauma and were inconsistent with a birth injury or fall and that

Perkins did not want imaging or bloodwork performed or to stay at the hospital overnight.

C.S. 2 was discharged from the hospital that day. The next day, Friday, July 15, 2022, Rivera spoke to a doctor from Massachusetts General Hospital's child protection team, who told him that "there [wa]s no medical indication on the cause of [C.S. 2's] injury" but that "the tests indicate[d] that it was nonaccidental." Id. at 7. The doctor further stated that "it [wa]s rare for a child to have these rib fractures," which were inconsistent with falling off a bed. Id. Rivera asked the doctor whether the injury could have been caused by C.S. 2's being "caught between barricades" (i.e., the slats of C.S. 1's bed); the doctor responded that "she would not be sure" but that explanation "would still be hard to believe." Id.

The above information from DCF's investigation was memorialized in a 51B Report. Plaintiffs dispute the truth of some of the contents of the 51A and 51B Reports but do not dispute that the reports contained the above information.

**C.   DCF's Decision to Take Emergency Temporary Custody**

At around 4:15pm on Friday, July 15, 2022, Butterfield (an Area Program Manager for DCF) was called by a DCF attorney and first informed about the investigation. The DCF attorney told Butterfield about C.S. 2's rib fractures; that C.S. 2's parents' explanations were inconsistent with medical expertise; that

medical professionals had concerns that the injuries may have been intentionally inflicted; and that C.S. 1 had previously sustained burns to his stomach. Butterfield was concerned that DCF's safety plan for the upcoming weekend was inadequate because it allowed both parents to remain at home with C.S. 2 without another adult. Butterfield decided to send a DCF response worker to visit Plaintiffs' residence again immediately.

In response to Butterfield's directive, Rivera visited Plaintiffs' home unannounced at 5:15pm. When Rivera arrived, C.S. 1 "was walking around and was smiling," and C.S. 2 "looked presentable" and was being held by his grandmother. Id. The family and Rivera agreed that DCF would conduct the next home visit on Monday at noon. Rivera recorded this information in the 51B Report.

Butterfield reviewed the 51A and 51B Reports and again discussed her concerns with DCF attorneys. She then called Gemski (the Regional Director for DCF) and informed her about the investigation. Butterfield told Gemski about the 51A and 51B Reports and Butterfield's conversations with DCF attorneys; that medical staff had found C.S. 2's injuries consistent with nonaccidental blunt force trauma and inconsistent with falling off a bed; that Perkins had a flat affect at the hospital and had initially refused an MRI for C.S. 2; that DCF attorneys had worries about the weekend safety plan; that Butterfield had concerns based on the ages of C.S. 1 and C.S. 2 and their inability to seek help;

10

and that Butterfield believed both children were at imminent risk of harm. After Gemski was filled in, she and Butterfield jointly decided that DCF should seek emergency temporary custody of the children and remove them from their home. They did not seek a court order.

At around 8:00pm, Butterfield initiated the removal process by calling DCF's emergency response worker hotline. Griffin, who had not been involved in the investigation since his meeting with Rivera and Piedade on Thursday morning, was again working as the on-call emergency response supervisor. Butterfield told Griffin of the decision to remove the children. Butterfield and Gemski had no further involvement in the removal process.

An hour later, at approximately 9:07pm, DCF emergency response workers Arruda and Kalvinek were contacted and instructed to conduct the emergency removal. Arruda, Kalvinek, and Griffin discussed that C.S. 2 had rib fractures that doctors believed were nonaccidental and that DCF management had decided the children needed to be removed.

### D. Arrival at Plaintiffs' Residence

After midnight, in the early hours of Saturday, July 16, 2022, Arruda and Kalvinek went to the Waltham Police Department to request police assistance with the removal of C.S. 1 and C.S. 2, as is DCF's practice. The Waltham Police Department dispatched Officers Makrigianis and Visco to assist. Arruda and Kalvinek

informed Officer Makrigianis that C.S. 2 had sustained an unexplained rib fracture that was deemed nonaccidental by medical providers; Officer Makrigianis relayed to Officer Visco that the removal was due to an unexplained broken rib. At around 1:00am, Arruda, Kalvinek, and Officers Makrigianis and Visco arrived at Plaintiffs' residence in Waltham.

Plaintiffs lived in the ground-floor apartment of a two-unit building. The other apartment, which was separate and distinct from Plaintiffs' apartment, was on the second floor. The building had three means of ingress and egress: a back door leading directly to the second-floor apartment, another back door leading directly to the kitchen of Plaintiffs' apartment on the ground floor, and a front exterior door facing the street. The front exterior door had no labeling listing the apartments, signage prohibiting entry, or buzzers to alert residents of visitors' presence. Nor was there any button inside Plaintiffs' apartment to unlock the front exterior door. Plaintiffs typically locked the front exterior door at night, but the door was not always locked.

Immediately inside the front exterior door was an area that the parties refer to as a "breezeway." On the left side of the breezeway was an interior door leading to the living room of Plaintiffs' apartment. That interior door had its own lock and chain, and Plaintiffs locked it every night. On the right side of the breezeway was a staircase leading to the second-floor

apartment. The breezeway was thus accessible to both sets of tenants. The following is a photograph of the view of the breezeway (and Plaintiffs' closed apartment door) through the open front exterior door:



Dkt. 201-8 at 2.

The lease for Plaintiffs' apartment provided that "[n]o receptacles, vehicles, baby carriages or other articles or obstructions shall be placed in the halls or other common areas or passageways," Dkt. 201-9 at 24, and required passageways to be used only for entry and exit. Plaintiffs nonetheless used the breezeway to store items such as a stroller and a car seat. The tenants of the upstairs unit rarely, if ever, entered or exited through the breezeway, instead preferring to access their apartment from the back door.

13

When Arruda, Kalvinek, and Officers Makrigianis and Visco arrived at the building at around 1:00am on Saturday, July 16, 2022, the front exterior door was closed but unlocked. They entered the breezeway, and Officer Makrigianis knocked on the interior door to Plaintiffs' apartment. They did not have a warrant, a court order, or any paperwork from DCF.

### E.    Removal of C.S. 1 and C.S. 2

Upon hearing Officer Makrigianis's knock, Plaintiffs partially opened their apartment door. They refused to fully open the door, allow anyone to enter the apartment, or surrender custody of C.S. 1 and C.S. 2. After learning that the DCF workers and police officers did not have a warrant, Plaintiffs asked them to leave.

Following these initial conversations, Officer Makrigianis contacted Sergeant Scichilone, who came to the scene. Sergeant Scichilone was told about C.S. 2's rib fracture and that Sabey and Perkins were refusing to allow DCF to remove their children. Sabey asked Sergeant Scichilone if he had a warrant, and, after Sergeant Scichilone responded that he did not, Sabey told him to leave.

Sergeant Scichilone then called his supervising officer, Lieutenant Couture, at approximately 1:13am to seek further guidance. Sergeant Scichilone told Lieutenant Couture that C.S. 2 had an unexplained broken bone and that Sabey and Perkins were not allowing the DCF workers or police officers to enter the apartment.

He further explained that DCF had told the officers that DCF had an emergency custody order to remove the children but that there was no paperwork. Lieutenant Couture asked Sergeant Scichilone to arrange for Plaintiffs' attorney, Paul Moraski ("Attorney Moraski"), to call Lieutenant Couture to discuss the situation.

Meanwhile, Kalvinek called Griffin and informed him that Sabey and Perkins were not allowing entry. Griffin then spoke to Lieutenant Couture on the phone. Griffin explained that the removal decision was made by Gemski, who was "way up high on [DCF's] chain of command," "way above [his] paygrade," and "like [his] boss's boss's boss." Dkt. 210-44 at 1:25-1:34, 2:41-3:05. Lieutenant Couture asked Griffin if other police departments had forced entry into a house while accompanying DCF for a removal, and Griffin confirmed that he had "seen that." Id. at 2:00-2:07. Griffin also said that in some instances, if police tell parents that they will force entry, the parents "might decide to open the door and surrender the child." Id. at 2:20-2:33. Additionally, Griffin said that he had seen other police departments "take[] down the door," including without any paperwork. Id. at 2:36-2:42.

At around 1:25am, Lieutenant Couture called Chief O'Connell. He told Chief O'Connell that a senior DCF official had decided to remove C.S. 1 and C.S. 2; that C.S. 2 had a broken bone that could not have been caused by a fall; that Sabey and Perkins were refusing to open the door; and that discussions were ongoing. Chief

O'Connell directed Lieutenant Couture to "continue talking for a while" and to "say we will have to eventually force the door." Dkt. 210-47 at 1:48-2:10. Lieutenant Couture explained that the officers could not "just walk away" because DCF had told them that "basically it's an exigent circumstance and the kids are in danger." Id. at 2:39-2:47. When Chief O'Connell asked if there was any "immediate danger," Lieutenant Couture replied: "They don't know, that's why they got the order . . . . They don't know what's going on in there." Id. at 3:20-3:33.

Chief O'Connell further stated that he did not "want to rush" the situation and that "a peaceful resolution . . . would be the best route instead of kicking the door in." Id. at 1:54-1:56, 5:08-5:12. He suggested calling the Northeast Massachusetts Law Enforcement Counsel ("NEMLEC"), a consortium of police personnel from different agencies. The parties dispute whether NEMLEC would have tried to facilitate peaceful negotiations before forcing entry with a SWAT team. When Lieutenant Couture asked Chief O'Connell whether NEMLEC would "bring their team out, like the SWAT" team, Chief O'Connell replied that he did not "know what they do" but that typically, "before [NEMLEC] breach[es] the door, they'd ask us." Id. at 5:25-5:42.

After speaking with Chief O'Connell, Lieutenant Couture spoke on the phone with Attorney Moraski, who had already discussed the evolving situation with Sabey and Perkins. Lieutenant Couture told

16

Attorney Moraski that DCF was effectuating an "emergency removal" with "no particular paperwork." Dkt. 210-52 at 1:20-1:28. He further relayed that Chief O'Connell had said that the officers "may have to breach the door" after "talk[ing] to [Sabey and Perkins] a little more." Id. at 1:39-1:55. Attorney Moraski asked Lieutenant Couture if Perkins would be allowed to breastfeed C.S. 2 before the removal. When Lieutenant Couture mentioned that Chief O'Connell instructed him to call NEMLEC to address the "exigent circumstance," Attorney Moraski responded that he was familiar with NEMLEC and that he would advise Sabey and Perkins to "let you guys in and remove the child." Id. at 2:31-3:02.

Lieutenant Couture then called Chief O'Connell again at around 1:56am. He summarized his conversation with Attorney Moraski, noting that he had relayed Chief O'Connell's instruction to bring in the "crisis negotiators" who "usually bring a team to breach a door." Dkt. 210-57 at 0:56-1:06.

Meanwhile, Attorney Moraski called Sabey and Perkins after his conversation with Lieutenant Couture. He advised Sabey and Perkins to cooperate and surrender custody of C.S. 1 and C.S. 2 to DCF. He further stated that if Sabey and Perkins refused to do so, the police would breach the apartment door and forcibly enter.

Sabey then asked the officers present at Plaintiffs' home whether they were ready to breach the door, and they responded that they were. Similarly, Kalvinek had told Perkins earlier that

the DCF workers and police officers would not leave until they had C.S. 1 and C.S. 2 in custody and that if Sabey and Perkins did not hand over the children and open the door, then there would be consequences.

After more than an hour and a half had elapsed since the DCF workers and police officers arrived at the residence, Sabey and Perkins surrendered C.S. 1 and C.S. 2, who were placed in a DCF vehicle. Sabey and Perkins claim that they turned over their children due to threats of forcible entry. Defendants assert that Plaintiffs surrendered the children voluntarily on the advice of Attorney Moraski.

Other than Kalvinek, who briefly entered Plaintiffs' apartment to help retrieve a bag that Perkins had packed for the children to take with them, no Defendant ever crossed the threshold of the interior door into Plaintiffs' apartment. Rather, Arruda, Sergeant Scichilone, and Officers Makrigianis and Visco remained in the breezeway or outside the exterior front door for the entirety of the encounter. No other Defendant was ever physically present at the premises.

### F.    Aftermath

In the late afternoon of Saturday, July 16, 2022, C.S. 1 and C.S. 2 were placed with their grandparents pending juvenile court proceedings. On Monday, July 18, 2022, the juvenile court granted DCF emergency temporary custody of the children. Sabey and Perkins

were given visiting privileges shortly thereafter. Following further proceedings, Sabey and Perkins were awarded conditional custody in August 2022 and full custody in November 2022, after which they and their children moved to Idaho. Sabey and Perkins deny that they ever abused their children, and the claims of child abuse never proved up.

## II.  **Procedural History**

On May 2, 2023, Plaintiffs filed suit against Butterfield, Griffin, Kalvinek, Arruda, Lieutenant Couture, Sergeant Scichilone, Officer Makrigianis, Officer Visco, and the City of Waltham. Plaintiffs brought five federal claims and three state-law claims alleging various violations related to the alleged search of their residence and removal of C.S. 1 and C.S. 2. On March 14, 2024, this Court dismissed some of Plaintiffs' claims, including both claims against the City of Waltham, but allowed other claims to proceed. See Sabey v. Butterfield, 720 F. Supp. 3d 82, 93 (D. Mass. 2024).

Plaintiffs filed an amended complaint on August 6, 2024, adding Gemski and Chief O'Connell as defendants. The amended complaint brings the following claims: (1) a Fourth Amendment claim asserted by Plaintiffs against Defendants for an alleged unreasonable search of Plaintiffs' home and curtilage (Count I); (2) a Fourth Amendment claim asserted by C.S. 1 and C.S. 2, through their parents, against Defendants for the alleged unreasonable

19

seizure of the children (Count II); (3) a Fourteenth Amendment claim asserted by Sabey and Perkins against Defendants for an alleged deprivation of their parental rights without due process (Count III); (4) a Massachusetts constitutional claim asserted by Plaintiffs against Defendants for an alleged unreasonable search of Plaintiffs' home and curtilage (Count VI); (5) a Massachusetts constitutional claim asserted by C.S. 1 and C.S. 2, through their parents, for the alleged unreasonable seizure of the children (Count VII); and (6) a Massachusetts Privacy Act claim asserted by Plaintiffs against Gemski and the Police Defendants for an alleged interference with Plaintiffs' rights to privacy (Count VIII).[3] Now before the Court are the parties' cross-motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir.

---

[3] The Court previously dismissed Plaintiffs' Massachusetts Privacy Act claim against the DCF Defendants other than Gemski. See Sabey, 720 F. Supp. 3d at 92-93. The amended complaint also lists two counts against the City of Waltham (Counts IV and V); Plaintiffs acknowledge these claims were already dismissed but expressly "reserve the right to appeal" their dismissal. Dkt. 113 ¶ 21a.

2018) (quoting <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 23-24 (1st Cir. 2017)). "A fact is material" if "it has [the] potential of changing a case's outcome." <u>Doe v. Trs. of Bos. Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018).

"The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st Cir. 2018). Where "parties cross-move for summary judgment, 'the court must [examine] each motion separately, drawing inferences against each movant in turn.'" <u>Vazquez-Velazquez v. P.R. Highways & Transp. Auth.</u>, 73 F.4th 44, 51 (1st Cir. 2023) (alteration in original) (quoting <u>Viscito v. Nat'l Plan. Corp.</u>, 34 F.4th 78, 83 (1st Cir. 2022)).

## DISCUSSION

The Court addresses each of the six remaining claims in turn, beginning with Plaintiffs' three federal claims and then turning to their three state-law claims.

## I.   Federal Claims

Before reaching the merits of Plaintiffs' federal claims, the Court must adjudicate two threshold issues. First, Chief O'Connell contends that the Court lacks subject matter jurisdiction to resolve Count III by operation of the <u>Rooker-Feldman</u> doctrine, which "divest[s] lower federal courts of jurisdiction to hear certain cases brought by parties who have lost in state court."

Klimowicz v. Deutsche Bank Nat'l Tr. Co., 907 F.3d 61, 64 (1st
Cir. 2018). Chief O'Connell argues that Count III attempts to
relitigate arguments Plaintiffs purportedly already lost when the
juvenile court awarded DCF temporary custody of Plaintiffs'
children in July and August 2022. This argument fails. The
Rooker-Feldman doctrine applies only where a plaintiff
"impermissibly invite[s] the district court to review and reject
one or more final state-court judgments." Id. at 66; see, e.g.,
id. (applying the Rooker-Feldman doctrine to a plaintiff's bid to
"vacate and set aside the Land Court's final judgment of
foreclosure" and "enjoin[] enforcement of the Housing Court's
order granting [a bank] possession of the [plaintiff's]
property"). Here, Plaintiffs do not -- and indeed, cannot, because
they now have full custody of their children -- seek to undo the
juvenile court's award of temporary custody of C.S. 1 and C.S. 2
to DCF; rather, Plaintiffs seek damages based on alleged
constitutional violations during the initial removal of the
children.

Next, Butterfield and Gemski claim that they have absolute
immunity from Counts II and III. They contend that their decision
to remove C.S. 1 and C.S. 2 was akin to the "quasi-prosecutorial
function[] [of] initiating court proceedings." Dkt. 207 at 25. The
Court rejects this argument. The removal decision was more
"administrative" than prosecutorial. Penate v. Kaczmarek, 928 F.3d

128, 136 (1st Cir. 2019) (quoting <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 278 (1993)). Thus, in making that decision, Butterfield and Gemski were "'in no different position[s] than other executive officials,' such as police," for whom qualified immunity -- not absolute immunity -- "is the norm." <u>Id.</u> (quoting <u>Buckley</u>, 509 U.S. at 278); <u>see</u> <u>Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.</u>, 724 F.3d 687, 694 (6th Cir. 2013) ("When the social workers removed the children from the home, they were acting in a police capacity rather than as legal advocates.").

Although absolute immunity does not apply, Plaintiffs' claims must clear the hurdle of qualified immunity. Defendants "are entitled to qualified immunity under 42 U.S.C. § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time'" of that violation. <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 62-63 (2018) (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)). "'Clearly established' means that, at the time of the officer's conduct, the law was '"sufficiently clear" that every "reasonable official would understand that what he is doing"' is unlawful." <u>Id.</u> at 63 (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011)). To be clearly established, a legal rule must be "dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority."'" <u>Id.</u> (quoting <u>al-Kidd</u>, 563 U.S. at 741-42); <u>see also</u> <u>Rivas-Villegas v. Cortesluna</u>, 595 U.S. 1, 6

(2021) (per curiam) (requiring plaintiffs in most instances to "identify a case that put [the defendant] on notice that his specific conduct was unlawful").

The Court analyzes each of Plaintiffs' federal claims in turn through this lens of qualified immunity. As explained below, the Court concludes that summary judgment must be granted to Defendants on all federal claims except for C.S. 1 and C.S. 2's Fourth Amendment seizure claim (Count II) against Butterfield and Gemski.

## A. Fourth Amendment Claim Regarding Alleged Search of Plaintiffs' Home (Count I)

Plaintiffs' first claim is that Defendants committed an unconstitutional search by remaining in the breezeway even after they were asked to leave. Plaintiffs argue that the breezeway was part of their apartment's curtilage.[4] Defendants respond that the breezeway was not part of the apartment's curtilage and thus that no Fourth Amendment search occurred.

The Supreme Court has recognized that curtilage -- i.e., "the area 'immediately surrounding and associated with the home'" -- is "part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)); see, e.g., id. (holding that curtilage includes "a home's porch or side garden"). "When a law enforcement

---

[4] Plaintiffs do not argue that a Fourth Amendment violation occurred "[u]nder the reasonable expectations [of privacy] test." United States v. Bain, 874 F.3d 1, 12 (1st Cir. 2017).

officer physically intrudes on the curtilage . . . , a search within the meaning of the Fourth Amendment has occurred" and is "presumptively unreasonable absent a warrant." Collins v. Virginia, 584 U.S. 586, 593 (2018). A limited exception exists under which officers have an "implicit license . . . to approach the home . . . , knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Jardines, 569 U.S. at 8.

It is undisputed that the Defendants present at Plaintiffs' residence on July 16, 2022, remained in the breezeway even after being asked to leave. The key contested legal issue is whether the breezeway constituted curtilage of Plaintiffs' apartment. Defendants argue that the breezeway was not curtilage because it was a shared space accessible by the upstairs tenants.

Neither the Supreme Court nor the First Circuit has answered the question of whether "a tenant's 'dwelling' can[] reasonably be said to extend beyond his own apartment and . . . any separate areas subject to his exclusive control." United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976) (quoting Commonwealth v. Thomas, 267 N.E.2d 489, 491 (Mass. 1971)); see United States v. Bain, 874 F.3d 1, 14 n.6 (1st Cir. 2017).[5] Generally speaking, in

---

[5] In Cruz Pagan, the First Circuit answered this question in the negative. See 537 F.2d at 558. This statement, however, predated the Supreme Court's articulation of the "common-law trespassory test" for Fourth Amendment searches. Bain, 874 F.3d at 12; see

determining the extent of a home's curtilage, courts assess
(1) "the proximity of the area claimed to be curtilage to the
home"; (2) "whether the area is included within an enclosure
surrounding the home"; (3) "the nature of the uses to which the
area is put"; and (4) "the steps taken by the resident to protect
the area from observation by people passing by." United States v.
Mumme, 985 F.3d 25, 40 (1st Cir. 2021) (quoting United States v.
Dunn, 480 U.S. 294, 301 (1987)). These factors weigh in Plaintiffs'
favor. The breezeway was directly adjacent to Plaintiffs'
apartment door, was an enclosed space, was used by Plaintiffs for
storage while rarely being used by the upstairs tenants, and was
accessible to the public only through an exterior door which
Plaintiffs often locked at night. Based on the above factors, the
Court therefore concludes that the breezeway was part of
Plaintiffs' curtilage.

But Count I fails at the second step of the qualified immunity
inquiry: No clearly established law placed a reasonable officer on
notice that the breezeway was curtilage. Plaintiffs fail to
"identify a case" from the First Circuit holding that any area

---

Cruz Pagan, 537 F.2d at 558 (considering "concepts of curtilage"
as part of "the Katz inquiry" into reasonable expectations of
privacy). And in Bain, the First Circuit expressly walked back its
language from Cruz Pagan, writing that that language "was
unnecessary to Cruz Pagan's holding" and "was therefore dicta."
Bain, 874 F.3d at 14 n.6; see id. ("[W]e do not think Cruz Pagan's
broad declaration about the scope of a condominium unit's curtilage
binds us.").

outside an apartment door (or its lock, see Bain, 874 F.3d at 14-15) -- let alone an area accessible to other tenants -- can be curtilage. Rivas-Villegas, 595 U.S. at 6. Plaintiffs point to French v. Merrill, but that case involved a "dwelling [with] a single front entryway" and a "single kitchen." 15 F.4th 116, 122 (1st Cir. 2021); see id. ("[Defendants] describe [Plaintiff]'s residence as 'more akin to an apartment building' -- presumably compared to a single-family home -- but they fail to further explain that comparison.").

Nor was there "a robust 'consensus of cases of persuasive authority'" in July 2022 indicating that the breezeway was curtilage. al-Kidd, 563 U.S. at 742 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). Circuit courts have varied in their treatment of whether shared spaces can constitute curtilage. Compare, e.g., United States v. Hopkins, 824 F.3d 726, 732 (8th Cir. 2016) (holding that area "six to eight inches" from townhouse door was curtilage despite being shared by two neighbors), with, e.g., United States v. Jackson, 728 F.3d 367, 373-74 (4th Cir. 2013) (holding that grass between sidewalk and apartment's back patio was not curtilage, including because it was shared by other tenants). Indeed, at least one circuit has held that "common property" can rarely, if ever, be curtilage, and has stated that the "general consensus [is] that common areas shared by all tenants of an apartment building usually will not qualify as . . .

27

curtilage." <u>United States v. Johnson</u>, 148 F.4th 287, 295 (4th Cir. 2025) (emphasis omitted), <u>petition for cert. filed</u>, No. 25-774 (U.S. Jan. 2, 2026). It thus was not clearly established that Defendants were intruding on Plaintiffs' curtilage. The Court therefore will enter summary judgment for Defendants on Count I.

One matter remains. Unlike the other Defendants, Kalvinek entered Plaintiffs' actual apartment, not just the breezeway. After Sabey and Perkins had acceded to the demands that they turn over C.S. 1 and C.S. 2, Kalvinek briefly crossed the threshold of Plaintiffs' apartment to retrieve a bag that Perkins had packed for the children. Although Sabey and Perkins objected to Defendants' entry into their home to seize C.S. 1 and C.S. 2, Plaintiffs develop no argument that Sabey and Perkins did not consent to Kalvinek's assistance with the bag once the children were already being removed. Plaintiffs therefore have forfeited that argument. Summary judgment is warranted on Count I for all Defendants, including Kalvinek.

### B. Due Process Claim Regarding Alleged Deprivation of Sabey's and Perkins' Parental Rights (Count III)

The Court next analyzes Count III, in which Sabey and Perkins allege that Defendants deprived them of their parental rights without due process. Defendants respond that the removal of C.S. 1 and C.S. 2 conformed with due process because Defendants reasonably suspected child abuse.

The Fourteenth Amendment's Due Process Clause protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Tower v. Leslie-Brown, 326 F.3d 290, 298 (1st Cir. 2003) (quoting Troxel v. Granville, 530 U.S. 57, 66 (2000) (plurality opinion)). That protection includes both substantive and procedural components. See Suboh v. Dist. Att'y's Off., 298 F.3d 81, 91 (1st Cir. 2002). First, the deprivation of fundamental parental rights can violate substantive due process. See Tower, 326 F.3d at 298. Second, in order to comply with procedural due process after taking emergency custody of a child, the government must provide "an adequate post-deprivation hearing within a reasonable time." Id. (quoting Suboh, 298 F.3d at 94).

Only substantive due process is at issue here. Under that rubric, the removal of a child from a parent's custody violates the Fourteenth Amendment unless "an objectively reasonable suspicion of abuse justifies protective measures." Id. (quoting Hatch v. Dep't for Child., Youth & Their Fams., 274 F.3d 12, 21 (1st Cir. 2001)). In particular, the First Circuit has held that a social worker may "take temporary custody of a child, without a hearing, when [she] has a reasonable suspicion that child abuse has occurred (or, alternatively, that a threat of abuse is imminent)." Carter v. Lindgren, 502 F.3d 26, 30 (1st Cir. 2007) (quoting Hatch, 274 F.3d at 22). "Reasonable suspicion depends on

the content of the information possessed by the state actors and its degree of reliability, considered in the totality of the circumstances." Piccone v. McClain, 586 F. App'x 709, 711 (1st Cir. 2014) (per curiam).

The Court begins its analysis with Butterfield and Gemski, who decided to order the removal of C.S. 1 and C.S. 2. The undisputed evidence demonstrates that Butterfield and Gemski "had an objectively reasonable suspicion that child abuse had occurred" to C.S. 2. Carter, 502 F.3d at 30. The 51A and 51B Reports, the contents of which Butterfield reviewed and conveyed to Gemski, indicated that C.S. 2 had suffered two fractured ribs; that medical professionals determined those injuries were consistent with nonaccidental blunt force trauma; that Sabey's and Perkin's explanations for how the injuries may have accidentally occurred were deemed not credible by those medical professionals; and that Perkins initially declined a recommended MRI for C.S. 2.[6] Butterfield and Gemski were entitled to rely on the opinions of medical professionals who reported that C.S. 2's injuries likely were intentionally inflicted. Cf. Piccone, 586 F. App'x at 711 (holding that DCF justifiably relied on "report from a day care

---

[6] Defendants also point out that the reports stated that Perkins had a "flat affect" and "rolled her eyes" when asked about C.S. 2's injuries. Considering that Perkins was bringing her three-month-old child to the hospital in the middle of the night, the Court does not credit that her "affect" could reasonably be viewed as relevant to whether abuse had occurred.

center employee" containing "seemingly credible" allegations of abuse where "[s]imply viewing the child neither proved nor disproved the abuse allegations").

Butterfield and Gemski did not, however, have a reasonable suspicion that a threat of additional abuse was imminent. See Carter, 502 F.3d at 30. The 51B Report stated that C.S. 2's rib fractures were between ten days and six weeks old and were healing. It also reported that C.S. 2's pediatrician did not have any concerns based on prior medical appointments. Further, Butterfield and Gemski knew that each time Rivera and Piedade saw C.S. 2 during their investigation, he seemed comfortable and unharmed. There was no other evidence of domestic abuse (which Sabey and Perkins denied), and Plaintiffs' home was determined to be in safe condition. C.S. 1 also told Piedade that everyone got along at home and denied any safety concerns. In sum, at the time they decided to take custody of C.S. 2 in the middle of the night, Butterfield and Gemski were aware of no evidence to support a reasonable suspicion of imminent future abuse before they could get a court order.

Although "even a single instance of abuse" may sometimes give rise to a reasonable suspicion of imminent further abuse, Hatch, 274 F.3d at 21, the information available to Butterfield and Gemski was insufficient to allow that inference here. See Lowther v. Child. Youth & Fam. Dep't, 101 F.4th 742, 766 (10th Cir. 2024)

31

("[E]vidence of past abuse may demonstrate a threat of imminent harm, but it will not always do so."). Simply put, the information regarding C.S. 2's healing rib fractures is a far cry from the types of evidence typically found to create an objectively reasonable suspicion of imminent child abuse. See, e.g., Gates v. Tex. Dep't of Protective & Regul. Servs., 537 F.3d 404, 429-30 (5th Cir. 2008) (deeming it "a close call" whether abuse was reasonably suspected to be imminent where "[s]everal children corroborated the story that [a parent] had punched or kicked [his child] that morning"). That is especially true where, as here, Butterfield and Gemski knew of various mitigating factors suggesting that C.S. 2 was not likely to be subject to imminent harm or neglect over the weekend.

The Court thus is confronted with a situation in which there existed a reasonable suspicion of past abuse but not of imminent abuse. The Tenth Circuit faced the same circumstance in Lowther. There, the Tenth Circuit acknowledged "some ambiguity in[] [its] precedent" regarding whether a "reasonable suspicion of past abuse, even in the absence of reasonable suspicion of imminent harm," sufficed to allow the removal of a child. Lowther, 101 F.4th at 765. The court clarified that a reasonable suspicion of imminent abuse was required, but held that the ambiguity from previous cases meant that the defendants had not run afoul of clearly established

precedent by removing a child based solely on a reasonable suspicion of past abuse. See id. at 766-67.

The same outcome is required here. First Circuit precedent is unclear as to whether a single instance of past abuse necessarily permits DCF to take custody of a child without running afoul of substantive due process. In this Court's view, a reasonable suspicion of imminent abuse is required, and thus Butterfield and Gemski committed a due process violation (unless Sabey and Perkins consented). See, e.g., Hatch, 274 F.3d at 21 (noting that past abuse may create reasonable suspicion of "an exigent circumstance sufficient to warrant immediate state action on a child's behalf"); Suboh, 298 F.3d at 94 (describing Hatch as requiring a "reasonable suspicion of imminent danger"); Carter, 502 F.3d at 11 (emphasizing "risk to the safety of the child"). "To be sure, evidence of past abuse may demonstrate a threat of imminent harm, but it will not always do so." Lowther, 101 F.4th at 766.[7]

But this Court cannot ignore the disjunctive phrasing of the First Circuit's standard, which on its face requires reasonable suspicion that a child "has been abused or is in imminent danger."

---

[7] The Court finds persuasive Lowther's statement that the "[f]actors important to assessing the risk of imminent harm" based on past abuse "include, but are not limited to, the strength of the evidence indicating prior abuse, the severity of the prior abuse, the temporal proximity to the prior abuse, the identity of the alleged abuser, the alleged abuser's access to the child, and whether there is time to obtain a warrant or judicial authorization." 101 F.4th at 766.

Tower, 326 F.3d at 299 (emphasis added); see Doe v. District of Columbia, 796 F.3d 96, 104 (D.C. Cir. 2015) (describing First Circuit's precedent as creating "a very low standard" that "could allow for the removal of a child . . . based on a single suspected incident"). "Given the disjunctive phrasing, reasonable officials could have concluded that under the Fourteenth Amendment, exigent circumstances were present if there was reasonable suspicion of past abuse, even in the absence of reasonable suspicion of imminent harm." Lowther, 101 F.4th at 765. Under the doctrine of qualified immunity, summary judgment thus must enter for Butterfield and Gemski on Plaintiffs' due process claim challenging their decision to take temporary custody of C.S. 2 because the case law in this circuit was not clearly established.

The other Defendants are also protected by the doctrine of qualified immunity. Griffin was aware of many of the details of the investigation, and he, Arruda, Kalvinek, and the Police Defendants knew that C.S. 2 was injured, that medical professionals had deemed those injuries to be possibly nonaccidental, and that Sabey's and Perkins' explanations for the injuries were not accepted by those professionals. Moreover, these Defendants were all informed that Butterfield and Sabey had determined that the removal of C.S. 2 was necessary. Although state officials "should pursue 'reasonable avenues of investigation' . . . before removing children from parents' custody," Suboh, 298 F.3d at 96 (quoting

34

Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000)), Plaintiffs cite no cases suggesting that police and lower-level social workers cannot rely on senior DCF officials' determinations regarding temporary child custody. On the contrary, several courts have held that police officers are "entitled to reasonably rely on" social workers' determinations "that it [is] necessary to remove" children from their parents. Gates, 537 F.3d at 431; see, e.g., Halley v. Huckaby, 902 F.3d 1136, 1150 (10th Cir. 2018) (granting qualified immunity to police chief who "rel[ied] on [social workers'] instructions" regarding taking custody of child); Suboh, 298 F.3d at 95 (granting qualified immunity to defendant who reasonably relied on misinformation provided by another defendant regarding child custody decision). It thus was not clearly established that Griffin, Arruda, Kalvinek, and the Police Defendants could not act in "reasonable response to what [they] could have assumed to be an adequately supported" child custody decision by Butterfield and Gemski. Halley, 902 F.3d at 1151.

Finally, the Court also grants summary judgment to Defendants on Count III with respect to the removal of C.S. 1. Plaintiffs fail to "identify a case" placing Defendants on notice that when they permissibly take temporary custody of one child, they may not also take temporary custody of that child's sibling. Rivas-Villegas, 595 U.S. at 6. On the contrary, several cases reflect that "state officials routinely remove all of the children

35

from a home when they harbor reasonable suspicions of abuse of any one child." Arredondo v. Locklear, 462 F.3d 1292, 1302 (10th Cir. 2006); see, e.g., Tower, 326 F.3d at 298 (holding that a reasonable suspicion of abuse to "three older children" also justified the removal of two younger ones). Butterfield and Gemski thus are protected by qualified immunity for their decision to remove C.S. 1, and the other Defendants were entitled to rely on Butterfield and Gemski's determination that the removal of both children was necessary.

### C.  Fourth Amendment Claim Regarding Alleged Seizure of C.S. 1 and C.S. 2 (Count II)

In Count II, C.S. 1 and C.S. 2 bring a separate Fourth Amendment claim challenging their own seizure. This claim is distinct from the parents' due process claim. See, e.g., Lowther, 101 F.4th at 754 n.6; Kirkpatrick v. County of Washoe, 843 F.3d 784, 788-89, 788 n.2 (9th Cir. 2016) (en banc). This Court turns to basic Fourth Amendment principles, which apply even in the context of child welfare investigations. See Andrews v. Hickman County, 700 F.3d 845, 859 (6th Cir. 2012) (collecting cases); see also Gates, 537 F.3d at 429 (declining "to create a 'child abuse' exception to the Fourth Amendment"); Dubbs v. Head Start, Inc., 336 F.3d 1194, 1205 (10th Cir. 2003) ("There is no 'social worker' exception to the Fourth Amendment.").

While the First Circuit has not confronted the issue, see Kovacic, 724 F.3d at 699 n.5, various circuits have articulated similar standards for the warrantless seizure of a child. Those standards amount to a requirement "that the government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." Gates, 537 F.3d at 429 (footnote omitted); see also, e.g., Kovacic, 724 F.3d at 699 ("A seizure without consent or a warrant is a reasonable seizure if it is justified by exigent circumstances. . . . Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers." (cleaned up) (quoting Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999))); Halley, 902 F.3d at 1145 ("[S]ocial workers violate[] the Fourth Amendment when they seize[] a child from his home without judicial authorization or exigent circumstances."). And "exigent circumstances," in this context, refer to a reasonable suspicion of "imminent or ongoing" abuse, not just of past abuse. Kovacic, 724 F.3d at 695 (quoting Schreiber v. Moe, 596 F.3d 323, 330 (6th Cir. 2010)); see Gates, 537 F.3d at 429 (requiring "reasonable cause to believe that the child is in imminent danger"); Halley, 903 F.3d at 1146 (requiring a "reasonable suspicion of imminent abuse"); Kirkpatrick, 843 F.3d at 790 (requiring "reasonable cause to believe that the child is

in imminent danger of serious bodily injury" (quoting Wallis, 202 F.3d at 1138)).

The above-cited authorities, among others, constitute "a robust 'consensus of cases of persuasive authority'" clearly establishing by July 2022 that a state official must have judicial authorization, parental consent, or reasonable suspicion of imminent abuse in order to seize a child from their home consistent with the Fourth Amendment. al-Kidd, 563 U.S. at 742 (quoting Wilson, 526 U.S. at 617). "A 'robust consensus' does not require the express agreement of every circuit." Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020); see id. at 77 (noting that the agreement of three or four circuits is sufficient to clearly establish the law). This judicial consensus "provide[d] notice to every reasonable officer that" seizing a child based solely on a reasonable suspicion of past abuse, without any reasonable suspicion of imminent abuse, would be "unlawful" under the Fourth Amendment. Id. at 76.

Notably, that result is also consistent with Massachusetts statute, which provides that if DCF "has reasonable cause to believe a child's health or safety is in immediate danger from abuse or neglect," DCF shall take temporary custody of the child "if it has reasonable cause to believe that the removal is necessary to protect the child from abuse or neglect." Mass. Gen. Laws ch. 119, § 51B(c). This provision plainly requires a

reasonable suspicion of imminent abuse, not merely of past abuse, in order to remove a child. Although the Court does "not look to state law in determining the scope of federal rights, the fact that [state law] limited the power of [DCF] . . . in precisely the manner the Fourth Amendment would limit such power is indicative of the degree to which the Fourth Amendment limit was [clearly] established." Halley, 902 F.3d at 1149 (first and third alterations in original) (quoting Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 595 (10th Cir. 1999)).

The Court now applies these principles to Defendants, beginning with Butterfield and Gemski. As already discussed, see supra Section I.B, Butterfield and Gemski lacked reasonable suspicion of imminent abuse to C.S. 1 or C.S. 2. Their "reliance on weeks-old" injuries to C.S. 2 "simply do[es] not constitute exigent circumstances as a matter of law." Kovacic, 724 F.3d at 696. A reasonable official in their shoes would have understood that ordering the removal of the children without judicial authorization in such circumstances violated the children's clearly established Fourth Amendment rights unless parental consent was obtained.

Consent must be "freely and voluntarily given" in order to be valid; "there must be more than mere acquiescence in the face of an unfounded claim of present unlawful authority." Mumme, 985 F.3d at 36 (quoting United States v. Perez-Montañez, 202 F.3d 434, 438

(1st Cir. 2000)). In determining whether consent was voluntarily given, the Court considers "the totality of the circumstances," including the "possibly vulnerable subjective state" of Sabey and Perkins and any "evidence of inherently coercive tactics" used by the DCF Defendants and the Police Defendants. Id. (quoting United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989)).

There remains a genuine dispute of material fact regarding whether Sabey and Perkins consented to the removal of C.S. 1 and C.S. 2. Plaintiffs argue that Sabey and Perkins turned over their children based on Defendants' coercive tactics (such as arriving after midnight and remaining in the breezeway for over an hour), Defendants' statements that they would not leave until they obtained temporary custody of the children, and Plaintiffs' reasonable belief that Defendants would send a SWAT team or use other means to forcibly breach the door. Defendants respond that there were ongoing peaceful negotiations, that they next would have summoned a crisis negotiating team (but not necessarily a SWAT team) from NEMLEC, and that Plaintiffs consented to the removal of C.S. 1 and C.S. 2 voluntarily based on the advice of Attorney Moraski. Because the issue of consent involves hotly disputed facts, summary judgment cannot be granted to Plaintiffs, Butterfield, or Gemski on Count II.

Butterfield and Gemski argue that they cannot be liable under Count II because they did not physically participate in the removal

of C.S. 1 and C.S. 2 or supervise the tactics used by the other Defendants on July 16, 2022. But a reasonable jury could find Butterfield and Gemski liable for their own decision to order the removal of C.S. 1 and C.S. 2 in the middle of the night without judicial authorization, which "set in motion a series of events that [they] should have known would cause others to violate [the children's] Fourth Amendment rights." Halley, 902 F.3d at 1148; see Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) ("[S]upervisory officials may be liable on the basis of their own acts or omissions."). Further, a supervisor can be held liable for her subordinates' constitutional violations if the supervisor's actions have an "affirmative link" to the violations. Parker v. Landry, 935 F.3d 9, 14 (1st Cir. 2019). A reasonable jury could readily find that link present here, where Butterfield and Gemski's order to remove C.S. 1 and C.S. 2 "led inexorably" to the seizure of the children. Penate v. Hanchett, 944 F.3d 358, 367 (1st Cir. 2019) (quoting Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011)).

Although Count II may proceed against Butterfield and Gemski, the Court will grant summary judgment to the other Defendants on this claim. Those Defendants reasonably believed that exigent circumstances existed based on Butterfield and Gemski's directive to remove C.S. 1 and C.S. 2. It was not clearly established that those Defendants could not "reasonably rely on" senior DCF

41

officials' determination "that it [was] necessary to remove" both children due to a risk of imminent abuse. Gates, 537 F.3d at 431; see supra Section I.B. Although Griffin was more familiar than Arruda, Kalvinek, and the Police Defendants with the 51B investigation and some of the mitigating circumstances it uncovered, he had no involvement between Thursday morning and Friday afternoon, when Butterfield informed him of the decision to remove the children. He did not run afoul of clearly established law by relying on directives given by DCF officials who were, to use his own words, "way up high on [his] chain of command." Dkt. 210-44 at 1:25-1:34.

## II. State-Law Claims

The Court now turns to Plaintiffs' state-law claims. As explained below, the Court concludes that summary judgment must be granted to Defendants on all three claims.

### A. Massachusetts Constitutional Claims (Counts VI and VII)

Article 14 of the Massachusetts Declaration of Rights protects against "unreasonable searches[] and seizures" of one's "person," "house[]," "papers," and "possessions." Mass. Const. pt. 1, art. 14. This provision provides similar safeguards as the Fourth Amendment, see, e.g., Commonwealth v. DeJesus, 182 N.E.3d 280, 284 (Mass. 2022), and the parties do not suggest that any of the relevant standards are materially different for purposes of

this case. Instead, the parties treat the state constitutional requirements relevant to Counts VI and VII as coextensive with the Fourth Amendment requirements relevant to Counts I and II, respectively. The Court therefore does the same.

Plaintiffs bring Counts VI and VII through the Massachusetts Civil Rights Act ("MCRA"), which prohibits persons from "interfer[ing]" with constitutional or statutory rights "by threats, intimidation[,] or coercion." Mass. Gen. Laws ch. 12, § 11H; see also id. § 11I (creating private right of action). "The MCRA is co-extensive with § 1983 except on two points": first, the MCRA "does not require any state action," and second, the MCRA "requires a violation by threats, intimidation, or coercion." 3137, LLC v. Town of Harwich, 126 F.4th 1, 13 (1st Cir. 2025) (quoting Kelley v. LaForce, 288 F.3d 1, 10 (1st Cir. 2002)). Thus, as relevant here, Counts VI and VII require the same constitutional showings as Counts I and II, plus the additional showing of threats, intimidation, or coercion.

The parties further agree that Counts VI and VII must clear the same qualified immunity hurdle as Counts I and II. See Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) ("The same qualified immunity standard that applies under § 1983 has also been held to apply to claims under the MCRA." (quoting Kelley, 288 F.3d at 10)). The Court thus analyzes Plaintiffs' state constitutional claims under that framework.

43

### 1. Claim Regarding Alleged Search of Plaintiffs' Home (Count VI)

In Count VI, Plaintiffs again challenge Defendants' alleged unreasonable search of their home and curtilage. The parties do not identify any material differences between the Fourth Amendment and Article 14 of the Massachusetts Declaration of Rights with respect to this claim. Defendants thus are entitled to qualified immunity on Count VI because it was not clearly established that the breezeway in Plaintiffs' building constituted curtilage. See supra Section I.A; Wilber, 872 F.3d at 23 (affirming grant of summary judgment on an MCRA claim because "the grant of summary judgment to the defendants on [the plaintiff]'s § 1983 claim necessarily compel[led] that result").

### 2. Claim Regarding Alleged Seizure of C.S. 1 and C.S. 2 (Count VII)

Count VII, like Count II, is a claim asserted by C.S. 1 and C.S. 2 challenging their alleged unreasonable seizure. Once again, no party suggests that the analysis under Article 14 of the Massachusetts Declaration of Rights differs in any pertinent respect from the Fourth Amendment analysis. Summary judgment thus is warranted for Arruda, Kalvinek, Griffin, and the Police Defendants for the reasons described with respect to Count II. See supra Section I.C; Wilber, 872 F.3d at 23.

With respect to Butterfield and Gemski, it is undisputed that these Defendants did not participate in the physical removal of

C.S. 1 and C.S. 2 or communicate with the other Defendants during the removal. Butterfield and Gemski thus did not personally perform any acts of "threats, intimidation, or coercion." 3137, LLC, 126 F.4th at 13 (quoting Kelley, 288 F.3d at 10). Count VII therefore may only proceed against Butterfield and Gemski if other Defendants performed such acts and if Butterfield and Gemski can be held vicariously liable for those acts.

Courts differ on whether the doctrine of respondeat superior, which does not apply to § 1983 claims, nevertheless applies to MCRA claims. Compare Lyons v. Nat'l Car Rental Sys., Inc. (of Del.), 30 F.3d 240, 247 (1st Cir. 1994) ("[C]laims against employers under the MCRA cannot rest on the doctrine of respondeat superior."), with Pettiford v. Branded Mgmt. Grp., LLC, 237 N.E.3d 1191, 1197 (Mass. App. Ct. 2024) ("[A]n employer may be held liable under the doctrine of respondeat superior for an employee's violations of . . . the MCRA."); see also, e.g., Fernandes v. Sena, No. 20-cv-11612, 2021 WL 4452311, at *15 (D. Mass. Sep. 29, 2021) (holding that MCRA claims based on respondeat superior are permissible against private employers but not public ones). Given this unsettled law, it was not clearly established that Butterfield and Gemski could be held liable for the other DCF Defendants' actions on a respondeat superior theory.

Under § 1983, as previously noted, a supervisor may nonetheless be vicariously liable for a subordinate's violations

where there is an "affirmative link" between the supervisor's conduct and those violations. Parker, 935 F.3d at 14. But although the MCRA tracks § 1983 in most respects, there is no clearly established body of law on whether this theory of vicarious liability extends to the MCRA's unique requirement that a plaintiff demonstrate violations by "threats, intimidation[,] or coercion." Mass. Gen. Laws ch. 12, § 11H. On the contrary, several courts have rejected the possibility that supervisors can be vicariously liable for subordinates' threats, intimidation, or coercion under the MCRA. See Fernandes, 2021 WL 4452311, at *15; Armstrong v. Lamy, 938 F. Supp. 1018, 1042 (D. Mass. 1996); cf. Galego v. City of Fall River, No. 22-cv-12243, 2023 WL 8039295, at *9 (D. Mass. Nov. 20, 2023) (holding that failure to supervise cannot give rise to an MCRA claim). Therefore, even if the Defendants involved in the removal of C.S. 1 and C.S. 2 engaged in threats, intimidation, or coercion (for example, by allegedly threatening to breach the door to Plaintiffs' apartment), reasonable officials in Butterfield's and Gemski's positions would not have been on notice that they could be held vicariously liable for those actions under the MCRA.

The Court thus grants summary judgment to Butterfield and Gemski, along with the other Defendants, on Count VII.

**B.    Massachusetts Privacy Act Claim (Count VIII)**

Finally, in Count VIII, Plaintiffs claim that Gemski and the Police Defendants violated the Massachusetts Privacy Act, which provides each person with "a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. Although the amended complaint purports to bring this claim under the MCRA, this Court previously assessed the claim as an independent cause of action, see Sabey, 720 F. Supp. 3d at 92-93, and the parties continue to operate under that understanding at the summary judgment stage.

As the Court noted in dismissing Plaintiffs' Massachusetts Privacy Act claim against Butterfield, Griffin, Arruda, and Kalvinek, this statutory claim implicates common-law immunity, which protects public officials from liability "for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption" in performing a discretionary act. Id. at 93 (quoting Chaney v. City of Framingham, No. 18-cv-10413, 2019 WL 6496842, at *7 (D. Mass. Dec. 3, 2019)). Even drawing all reasonable inferences in Plaintiffs' favor, the record does not support a finding that any alleged privacy violations by the remaining Defendants "were the result of bad faith, malice, or corruption." Id.

Plaintiffs assert that "the Supreme Judicial Court has rejected blanket immunity when the Legislature has created a

statutory right of action." Dkt. 250 at 27. In support of that proposition, Plaintiffs cite <u>Nelson v. Salem State College</u>, 845 N.E.2d 338 (Mass. 2006). But in that case, the Supreme Judicial Court in fact found that defendants sued in their individual capacities <u>were</u> "entitled to common-law immunity" from a Massachusetts Privacy Act claim. <u>Id.</u> at 348. So too here: Gemski and the Police Defendants are entitled to common-law immunity and to summary judgment on Count VIII.

## ORDER

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for summary judgment (Dkt. 205); **ALLOWS** Chief O'Connell's motion for summary judgment (Dkt. 199); **ALLOWS** Lieutenant Couture, Sergeant Scichilone, Officer Makrigianis, and Officer Visco's motion for summary judgment (Dkt. 201); **ALLOWS** Griffin, Arruda, and Kalvinek's motion for summary judgment (Dkt. 217); and **ALLOWS IN PART** and **DENIES IN PART** Butterfield and Gemski's motion for summary judgment (Dkt. 206). Butterfield and Gemski's motion is allowed except as to Count II.


SO ORDERED.

                              /s/ PATTI B. SARIS
                              Hon. Patti B. Saris
                              United States District Judge